Barbara CONNER, Plaintiff–Appellant,

v.

Rudy G. REINHARD, et al.,
Defendants–Appellees.

No. 87–1940.

United States Court of Appeals,
Seventh Circuit.

Argued Dec. 1, 1987.

Decided May 19, 1988.

Victor M. Arellano, Lawton & Cates, S.C., Madison, Wis., for plaintiff-appellant.

James M. Kalny, Green Bay, Wis., for defendants-appellees.

Before WOOD, Jr. and CUDAHY, Circuit Judges, and WILL, Senior District Judge.[*]

HARLINGTON WOOD, Jr., Circuit Judge.

In an action brought under 42 U.S.C. § 1983, plaintiff Barbara Conner charged that she was fired from her job with the City of Green Bay in violation of her first amendment right to freedom of speech. Conner named as defendants Rudy Reinhard, her former supervisor, and the estate of Richard Zolper,[1] a former alderman for

---

[*] The Honorable Hubert L. Will, Senior District Judge for the Northern District of Illinois, is sitting by designation.

1. Richard Zolper died in 1984. Conner therefore named his estate, through Irene Zolper, the personal representative of the estate, as a defendant in this suit. For our own convenience, we will refer to this defendant as "defendant Zolper."

the City of Green Bay. The district court granted the defendants' motion for summary judgment based upon their affirmative defense of qualified immunity.

## I. FACTUAL BACKGROUND

Plaintiff Barbara Conner was hired as a Clerk Steno II for the Comptroller's Office of the City of Green Bay in February 1982. Defendant Rudy Reinhard, Comptroller for the City of Green Bay, was Conner's immediate supervisor.

In addition to her regular duties, Conner also took minutes at the Board of Ethics meetings. The Board of Ethics handled complaints that alleged violations of the city's Ethics Code. Defendant Richard Zolper was a member of the Board of Ethics in May 1982. On May 12, 1982, Conner was taking the minutes of a Board of Ethics meeting when a discussion arose concerning the use of money from the city contingency fund to investigate alleged wrongdoing by alderman Guy Zima. During the course of the meeting, the Board suspended the rules to allow interested parties to speak. The following exchange between the Board members and Barbara Conner took place:

Camilli: Is there anybody else that would like to speak?

Conner: I'd like to speak a little bit about the Contingency Fund not being for this purpose.

Marinan: What are you linked to?

Conner: I'm a citizen of Green Bay.

Marinan: You have no right to speak now.

Venci: Why? We suspended the (regular) order to let everybody speak.

Zolper: Well, if you're going to speak then we want your name and address and your position ... what you do for a living.

Marinan: And we want to cross examine you ... tell how you know that fact.

Venci: That's really intimidation, you guys.

Zolper: It's not.

Conner: I work for Rudy and I know that the Contingency Fund is not for this purpose.

Camilli: Your name, please, for the record.

Conner: Barbara Conner, 215 North Van Buren. I'm a citizen of Green Bay.

Camilli: You're also a city employee?

Conner: I'm a city employee and I have some concern about how we spend tax money.

Camilli: And you're aware of the Contingency Fund because of your work in the Comptroller's Office, is that correct?

Conner: Right. And I take the minutes of the Finance Committee meeting and I know the reticence with which they dip into the Contingency Fund.

Appendix of Plaintiff–Appellant at 165.

As the district court found, Zolper appeared to be angry with Conner at the meeting. A few days after the May 12th meeting, Zolper visited Reinhard in his office and, according to Conner, slammed the door shut.

On May 19, 1982, Conner received the following letter of reprimand from Reinhard:

In reference to the remark concerning the use of the Contingency Fund attributed to you at the May 12th, 1982, Board of Ethics Meeting, I must advise you that it was a case of poor judgment on your part when you expressed the views of the Comptroller's Office while acting as Recording Secretary for the Committee. If you had been attending the Hearing not as the Recording Secretary but as a private citizen your personal viewpoint would have been more appropriate.

In the future I would caution you, while acting as the Recording Secretary, not to speak for the Comptroller's Office unless questioned directly.

I am sorry this situation arose and hope to avoid a similar situation in the future.

Record Item 26 at 3.

Upon receiving this letter, Conner asked Reinhard what the letter meant. Reinhard

advised Conner not to speak on his behalf without prior authorization. Conner replied that if the situation occurred again, she would do the same thing. Shortly thereafter, Conner announced to the press that she had been fired.

Conner also wrote a long letter to Reinhard, dated May 20, 1982. In that letter, she expressed her disappointment at Reinhard's refusal to consider her right as an individual to express an opinion. Conner also opined that if Reinhard checked the transcript of the May 12th meeting, he would find that she had been expressing her personal viewpoint, and not that of the Comptroller's Office:

> I do not know the view of the Comptroller's Office. I did check with Lou Marchetti, chairman of the Finance Committee, about the use of the Contingency Fund, and as I had surmised from being present at Finance Committee Meetings, the Contingency Fund is for unforeseen emergencies and Acts of God, such as severe winters, floods, equipment breakdowns, etc. It is not for flying to Louisiana oil rigs to check on past activities of Councilman Guy Zima. It is not for personal vendettas.

Record Item 26 at 4. Reinhard terminated Conner's employment on May 24, 1982.

Conner initially filed an action regarding the events of May 1982 on March 11, 1983 in the Eastern District of Wisconsin, naming the City of Green Bay as defendant. Three months prior to the trial, Conner attempted to join Reinhard as a defendant, but the court denied that motion as untimely. The trial commenced with the city as the sole defendant. During the second day of trial, the district court granted the city's motion for a directed verdict because Conner failed to show a custom or policy that could result in municipal liability. Conner subsequently filed the present lawsuit on May 10, 1985, naming Rudy Reinhard and the estate of Richard Zolper as defendants.

On December 6, 1985, the defendants filed a motion for summary judgment based on the doctrine of claim preclusion.[2]

The district court denied that motion on April 18, 1986.

At the completion of discovery, the defendants again moved for summary judgment, this time on the basis of qualified immunity. On March 26, 1987, the district court granted the defendants' motion. We have jurisdiction over this appeal under 28 U.S.C. § 1291.

## II. ANALYSIS

Conner appeals the district court's ruling that the defendants are qualifiedly immune from suit. Conner also argues that because there are material factual issues in dispute, the district court erred in granting summary judgment. The defendants, of course, contend that the district court properly ruled on their motion for summary judgment. In addition, the defendants argue that even if this court finds that they are not entitled to qualified immunity, the doctrine of claim preclusion bars this suit. Finally, defendant Zolper claims that the plaintiff has no basis on which to hold him liable for her wrongful discharge.

### A. Qualified Immunity

#### 1. General Principles

■ The doctrine of qualified immunity shields government officials performing discretionary functions from liability for civil damages. The doctrine is designed to accommodate competing values. An action for damages may provide a citizen with her only means of vindication when an official violates her constitutional rights. Courts, however, must also protect against the danger that the fear of being sued will hamper officials in the proper discharge of their duties. Qualified immunity allows courts to quickly terminate insubstantial lawsuits, without denying worthy claimants their day in court. *Harlow v. Fitzgerald,* 457 U.S. 800, 814, 102 S.Ct. 2727, 2736, 73 L.Ed. 2d 396 (1982). Officials cannot receive qualified immunity, however, if their conduct violated clearly established constitutional rights of which a reasonable person

---

**2.** The traditional term for claim preclusion is     res judicata.

would have known. *Id.* at 818, 102 S.Ct. at 2738.

Summary judgment is proper only when there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c), *Donald v. Polk County*, 836 F.2d 376, 378–79 (7th Cir.1988). As this court has explained, "appellate review of a denial of summary judgment on the issue of qualified immunity is limited to the legal question of whether the law was well established at the time of the conduct." *Wade v. Hegner*, 804 F.2d 67, 70 (7th Cir.1986); *see Mitchell v. Forsyth*, 472 U.S. 511, 528, 105 S.Ct. 2806, 2816, 86 L.Ed.2d 411 (1985). "[I]f there are issues of disputed fact upon which the question of immunity turns, or if it is clear that the defendant's conduct did violate clearly established norms, the case must proceed to trial." *Green v. Carlson*, 826 F.2d 647, 652 (7th Cir.1987).

Conner has the burden of demonstrating that the defendants violated a constitutional right that was clearly established in May 1982. *Davis v. Scherer*, 468 U.S. 183, 197, 104 S.Ct. 3012, 3020, 82 L.Ed.2d 139 (1984); *Abel v. Miller*, 824 F.2d 1522, 1534 (7th Cir.1987). The Supreme Court recently provided courts with guidance in determining whether the law was clearly established at the time of an alleged constitutional violation:

> The contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right. This is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful, but it is to say that in the light of preexisting law the unlawfulness must be apparent.

*Anderson v. Creighton*, —— U.S. ——, 107 S.Ct. 3034, 3039, 97 L.Ed.2d 523 (1987) (citation omitted).

As this circuit has held: " 'The right must be sufficiently particularized to put potential defendants on notice that their conduct probably is unlawful.' ... Our conclusion is that the test for immunity should be whether the law was clear in relation to the specific facts confronting the public official when he acted." *Colaizzi v. Walker*, 812 F.2d 304, 308 (7th Cir. 1987) (quoting *Azeez v. Fairman*, 795 F.2d 1296, 1301 (7th Cir.1986)). We have repeatedly recognized the inherent difficulties in either characterizing the right too generally, *see, e.g., Azeez*, 795 F.2d at 1301, or describing the fact situation with such detail that each case becomes unique, *see, e.g., Wade v. Hegner*, 804 F.2d at 71. To overcome these problems, we have " 'required caselaw which clearly and consistently recognized the constitutional right.' " *Lojuk v. Johnson*, 770 F.2d 619, 628, (7th Cir.1985) (quoting *Coleman v. Frantz*, 754 F.2d 719, 730 n. 15 (7th Cir.1985)), *cert. denied*, 474 U.S. 1067, 106 S.Ct. 822, 88 L.Ed.2d 795 (1986). Although we do not require cases involving the exact fact pattern at bar, case law in a closely analogous area is essential to permit us to conclude that the constitutional right was clearly established at the time of the alleged violation. *Lojuk*, 770 F.2d at 628; *Benson v. Allphin*, 786 F.2d 268, 276 (7th Cir.1986) ("whenever a balancing of interests is required, the facts of the existing caselaw must closely correspond to the contested action before the defendant official is subject to liability under ... *Harlow* "), *cert. denied*, —— U.S. ——, 107 S.Ct. 172, 93 L.Ed.2d 109 (1987) (the Court denied two petitions for certiorari, Nos. 86–27 & 86–29). Of course, we must limit our analysis to cases decided prior to May 1982, when the alleged violation occurred. *Zook v. Brown*, 748 F.2d 1161, 1164 (7th Cir.1984).

### 2. Pickering *Balancing Test*

Since 1968, it has been established that government officials cannot prohibit public employees from exercising their right to engage in speech protected by the first amendment. In *Pickering v. Board of Education*, 391 U.S. 563, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968), a high school teacher was dismissed after his letter criticizing the school board's budgetary policies was published in a local newspaper. The Supreme Court found that the letter discussed a legitimate topic of public interest and therefore was entitled to first amendment

protection. Nevertheless, the Court held that the teacher's interest in freely expressing his views on matters of public concern must be balanced against his employer's interest in effective and efficient public service. *Id.* at 568, 88 S.Ct. at 1734. The Court found that the statements were not directed to anyone with whom the teacher had daily contact and therefore did not undermine discipline or harmony among co-workers. In addition, the teacher's employment relationships with the school board and superintendent were not ones calling for loyalty and confidence. Finally, the Court found that the teacher's statements did not interfere with the teacher's daily duties or the general operation of the school. The Court therefore concluded that the employer's interests did not outweigh the teacher's first amendment rights. *Id.* at 569–73, 88 S.Ct. at 1735–37.

■ Subsequent Supreme Court cases reaffirmed the right of public employees to speak out on matters of public concern. *Branti v. Finkel,* 445 U.S. 507, 100 S.Ct. 1287, 63 L.Ed.2d 574 (1980); *Givhan v. Western Line Consol. School Dist.,* 439 U.S. 410, 99 S.Ct. 693, 58 L.Ed.2d 619 (1979); *Mt. Healthy City School Dist. Bd. of Educ. v. Doyle,* 429 U.S. 274, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977); *City of Madison Joint School Dist. No. 8 v. Wisconsin Employment Relations Comm'n,* 429 U.S. 167, 97 S.Ct. 421, 50 L.Ed.2d 376 (1976); *Perry v. Sindermann,* 408 U.S. 593, 92 S.Ct. 2694, 33 L.Ed.2d 570 (1972).

The defendants concede that Conner's statements at the May 12th meeting involved a topic of public concern.[3] Under *Pickering* and its progeny, then, the defendants could justifiably retaliate against

Conner for her speech only if her statements were so disruptive that they substantially impeded the performance of her duties or interfered with the functioning of the office.

Therefore, we need to consider whether, under the clearly established law in May 1982, the statements were so disruptive that the defendants were justified in retaliating against Conner. In *Clark v. Holmes,* this court outlined factors to consider in the balancing process, including: (1) the effect of the plaintiff's conduct on discipline and harmony among co-workers; (2) the need for confidentiality; (3) whether the conduct impeded the employee in competently performing her daily duties; and (4) the need to encourage a close and personal relationship involving loyalty and confidence between the employee and her superiors. 474 F.2d 928, 931 (7th Cir.1972), *cert. denied,* 411 U.S. 972, 93 S.Ct. 2148, 36 L.Ed.2d 695 (1973). Because the balancing of factors is involved, we must consider whether any closely analogous case law prior to 1982 indicated that Conner had a clearly established right to speak at the Board of Ethics meeting without fear of retaliation by her employer. *See Benson v. Allphin,* 786 F.2d at 276.

### a. Discipline and Harmony

The defendants assert that Conner's statements were acts of insubordination and therefore must necessarily have affected the discipline and harmony among Conner's co-workers. In *Hanneman v. Breier,* 528 F.2d 750 (7th Cir.1976), Milwaukee policemen brought a class action against the chief of police and the City of Milwaukee.

---

**3.** Although the defendants do not dispute that the proper use of the contingency fund was a matter of public interest, the defendants claim that Conner's speech was not clearly protected because she appeared to be speaking on behalf of her employer. In ruling on the issue of qualified immunity, we must view the undisputed evidence in the light most favorable to Conner. *Green v. Carlson,* 826 F.2d at 650 ("when considering the qualified immunity issue on a motion for summary judgment, a district court should consider all of the undisputed evidence in the record, read in the light most favorable to the non-movant"). The primary undisputed evidence in this case consists of the actual words that Conner spoke at the Board of Ethics meeting. Those words could arguably be interpreted as either the viewpoint of a private citizen who also happened to be employed by the city, or as the official view of the Comptroller's Office as related by an employee of that office. We are bound, however, to draw all reasonable inferences in the light most favorable to Conner; therefore, we will assume that Conner was expressing her viewpoint as a private citizen, even though at the time she was performing her duties as an employee of the city.

The named plaintiffs were members of the Milwaukee Professional Policemen's Protective Association (MPPPA). A front-page story in a Milwaukee newspaper on September 16, 1970 had disclosed that the police department was conducting an internal investigation concerning the MPPPA. The following day, September 17, the MPPPA had distributed a letter to city and state officials. This letter had confirmed the factual details contained in the newspaper account. In addition, the letter had charged Police Chief Breier with conducting the investigation for improper purposes. The MPPPA officers were subsequently disciplined for violating a department rule prohibiting the disclosure of confidential police business. The plaintiffs claimed that the discipline imposed on them violated their first amendment rights. In applying the *Pickering* balancing test, we recognized that departmental discipline may be undermined when police officers disobey an official regulation and an express order not to disclose police business. Nevertheless, the MPPPA members did little damage by disclosing the information since the newspaper article had already revealed to the public that an investigation was underway. We weighed the department's interest in discipline against the police officers' first amendment interest in publicizing potential abuse by their police chief. In addition, we noted that the government officials and the public at large also had a first amendment interest in being informed of potential misuse of the department's investigatory power. We concluded that the department had not shown a compelling interest sufficient to outweigh the first amendment interests of the government officials and the public. *Id.* at 754-56.

Conner, like the policemen in *Hanneman*, has a compelling first amendment interest in pointing out to government officials what she perceived as misappropriation of public funds. In addition, both the public and government officials have a first amendment interest in being informed of the potential misuse of public funds. We

acknowledge that an insubordinate act by one worker potentially could have an undesirable effect on office harmony and discipline. Nevertheless, the defendants have not provided us with any evidence of actual harmful effects resulting from Conner's alleged insubordination. Thus, the potential for office disciplinary problems in this case is not sufficiently "persuasive" for us to conclude that this factor outweighs Conner's interest in free speech. *See Hanneman*, 528 F.2d at 753 (only where *Clark* factors "are present and persuasive may an individual's otherwise protected freedom of speech be subordinated to the state interest").

### b. Confidentiality

The defendants do not suggest that Conner's statement at the Board of Ethics meeting dealt with confidential information, nor is there any evidence that such was the case. As in *Pickering*, 391 U.S. at 572, 88 S.Ct. at 1736, and *Hanneman*, 528 F.2d at 755, the defendants have not shown that Conner was privy to information that was not accessible to the ordinary citizen or that her position made it difficult for the defendants to rebut her statements. *See also Donahue v. Staunton*, 471 F.2d 475, 481 (7th Cir.1972), *cert. denied*, 410 U.S. 955, 93 S.Ct. 1419, 35 L.Ed.2d 687 (1973).

### c. Performance of Daily Duties

The defendants claim that Conner's conduct at the May 12th meeting disrupted her from performing her regular duties. To support this claim, the defendants assert that Conner spent "considerable time" typing the transcript of the Board of Ethics meeting, although she was not requested to do so. In addition, Conner took time out from her work to discuss the Board of Ethics meeting with the mayor.[4]

In *Donahue v. Staunton*, 471 F.2d 475 (7th Cir.1972), *cert. denied*, 410 U.S. 955, 93 S.Ct. 1419, 35 L.Ed.2d 687 (1973), a chaplain was fired from his position with a state mental hospital after publicly criticiz-

---

4. We note that the defendants do not claim that Conner's conduct distracted her from adequate-

ly performing her duties as recording secretary at the May 12th meeting.

ing conditions at the hospital. This court held that the defendants violated the chaplain's first amendment right to speak on matters of public concern. The chaplain's regular duties included helping outside groups to understand the problems concerning patients, and interpreting the institution's problems and policies for the public. We found that "this was [not] such a critical responsibility of a Chaplain as to give the State a strong enough interest to interfere with the plaintiff's free speech rights." *Id.* at 481.[5] We concluded that the chaplain's individual interest in free speech, together with society's interest in uninhibited and robust debate on matters of public concern, outweighed the state's interest as an employer. *Id.*

The public has a legitimate interest in receiving information concerning abuse within public institutions, whether it be deplorable conditions in state mental hospitals or inappropriate use of taxpayers' funds. An employer certainly has a right to expect his employees to attend to their duties during working hours. Nevertheless, where the interference with the plaintiff's regular duties is de minimis or merely speculative, the employer's interest is not sufficiently persuasive to outweigh important first amendment rights. *See Hostrop v. Board of Junior College Dist. No. 515,* 471 F.2d 488, 492–93 & nn. 12, 14 (7th Cir.1972) (defendant must show evidence of the *actual* effects of plaintiff's speech before court will find that the employer was justified in discharging plaintiff), *cert. denied,* 411 U.S. 967, 93 S.Ct. 2150, 36 L.Ed. 2d 688 (1973). The defendants in this case do not indicate whether the time spent on the unauthorized activities prevented Conner from completing her regular duties. In addition, the defendants do not suggest nor does the record reveal the amount of time Conner spent on the allegedly unauthorized activities. This is not the kind of suffi-

ciently persuasive evidence necessary to outweigh the plaintiff's right to freedom of speech.

#### d. Loyalty and Confidence

Finally, the defendants argue that Conner's conduct discouraged a close and personal relationship between her and Reinhard in a situation calling for loyalty and confidence. Reinhard, as Conner knew, wished to avoid political controversy. The defendants assert that Conner's conduct thrust Reinhard into just such a controversy, arousing the ire of certain aldermen. In addition, when Reinhard asked Conner to refrain from repeating her conduct of May 12th, she replied that she would do the same thing again. Clearly, Conner and Reinhard disagree as to whether her comments at the Board of Ethics meeting should reasonably be interpreted as representing the view of the Comptroller's Office. Although Conner insisted that she would repeat the same behavior again, it is unclear whether she meant that she would voice her own individual opinion again, or whether she would speak as an employee of the Comptroller's Office again.

In *Hostrop v. Board of Junior College District No. 515,* we cautioned:

> *Pickering* should not be read to authorize the discharge of [a public employee] merely because he expresses an opinion that *could be interpreted* as a sign of disloyalty or an undermining of the confidence placed in him. Instead, *Pickering* holds that an employee's speech may be regulated only if a public entity can show that its functions are being substantially impeded by the employee's statements.

471 F.2d 488, 492 (7th Cir.1972) (emphasis added), *cert. denied,* 411 U.S. 967, 93 S.Ct. 2150, 36 L.Ed.2d 688 (1973).[6] This court has suggested that evidence of the actual

---

5. We also found of some importance the fact that when the chaplain was evaluated on those particular duties, he received a rating of "good." *Donahue,* 471 F.2d at 481.

6. In *Hostrop,* a college president was discharged after he prepared a confidential memorandum that proposed certain changes in the college's ethnic studies program. The memorandum was

to be circulated among his administrative staff, but somehow became public. This court found that the suggested changes contained in the memo did not by themselves provide evidence of an impaired working relationship between the president and the board. 471 F.2d at 492–93.

effects of the speech at issue is necessary before a court can find that an employer's functions have been substantially impeded by the employee's speech. *See id.* at 492–93 & nn. 12, 14. Such clear evidence is lacking here.

We find that a disputed issue of fact exists as to whether, and to what extent, Conner's conduct resulted in substantially damaging the working relationship between her and Reinhard. We realize that Conner's defiant answer may have caused Reinhard to question her loyalty to him. However, viewing Conner's statement that she would do the same thing again in the light most favorable to her, we find that she was merely reasserting her first amendment right to speak out on matters of public concern at meetings that are open for public comment. Since this is at most a statement that "could be interpreted" as undermining loyalty and confidence, under *Hostrop* this statement is not sufficient justification for Reinhard to fire Conner without actual evidence of an impaired working relationship.

### e. Expression During Working Hours

As our review of case law indicates, the majority of analogous cases involve the speech of an off-duty public employee speaking out on a matter of public concern. We do not believe that the fact that Conner was working when she spoke should be a distinguishing factor in determining whether her speech was protected. In *Givhan v. Western Line Consolidated School District,* 439 U.S. 410, 99 S.Ct. 693, 58 L.Ed.2d 619 (1979), the Supreme Court extended first amendment protection to public employees who privately engage in speech regarding public concerns. The plaintiff, Bessie Givhan, was a public school teacher who frequently complained about various school policies, primarily racial segregation. Givhan presented her objections to the school principal in his private office during the school day. 439 U.S. at 412, 99 S.Ct. at 694, 555 F.2d 1309, 1312–13 (5th Cir.1977). Applying the *Pickering* balancing test, the Court concluded that Givhan's speech was entitled to first amendment protection. 439 U.S. at 414–15,

99 S.Ct. at 695–97. Thus, *Givhan* implicitly held that first amendment protection extends to public employees who express their opinions during working hours as well as those who engage in speech while off-duty. *See* Schauer, *"Private" Speech and the "Private" Forum: Givhan v. Western Line School District,* 1979 Sup.Ct.Rev. 217, 247–48.

The Supreme Court has also expressly recognized the right of a public employee to speak out at a public meeting. In *City of Madison Joint School District No. 8 v. Wisconsin Employment Relations Commission,* 429 U.S. 167, 97 S.Ct. 421, 50 L.Ed.2d 376 (1976), a nonunion teacher spoke out at a public school board meeting on a topic related to pending labor negotiations between the teachers' union and the school board. The Court affirmed the nonunion teacher's right to speak at the public meeting:

> [The teacher] addressed the school board not merely as one of its employees but also as a concerned citizen, seeking to express his views on an important decision of his government. We have held that teachers may not be "compelled to relinquish the First Amendment rights they would otherwise enjoy as citizens to comment on matters of public interest in connection with the operation of the public schools in which they work." Where the State has opened a forum for direct citizen involvement, it is difficult to find justification for excluding teachers who make up the overwhelming proportion of school employees and who are most vitally concerned with the proceedings.

*Id.* at 174–75, 97 S.Ct. at 426 (quoting *Pickering,* 391 U.S. at 568, 88 S.Ct. at 1734) (citations and footnote omitted).

Conner voiced her opinion at the Board of Ethics meeting only after the Board suspended the rules and invited public comment. If Conner had attended the meeting as a private citizen and given the same opinion, informing the Board that she was employed by the city, we believe that her speech clearly would have enjoyed first amendment protection under *Madison Joint School District.* The fact that she

was taking the minutes at the time she spoke should not disturb that finding since we must accept for purposes of summary judgment Conner's version that she merely gave her personal opinion during a portion of the meeting open for public comment. Like Bessie Givhan, Conner happened to be at work when she expressed her opinion on an important matter of public interest. While we realize Conner's conduct may have placed her employer in an awkward position, that alone is not sufficient grounds upon which to discharge her; rather, it is just another factor that must be weighed in balancing the city's interest as an employer.[7]

■ We believe that the foregoing Supreme Court and Seventh Circuit precedent clearly established that Conner had a first amendment right to speak as a private citizen on a matter of public concern at the Board of Ethics meeting in May 1982. Given the wealth of closely analogous case law concerning the first amendment right of public employees to speak on matters of public interest, the defendants should have been on notice that their conduct was probably unlawful. Assessing the *Clark* factors in light of the case law existing in 1982, we do not believe that the defendants have made an adequate showing that Conner's speech was sufficiently disruptive so that a reasonable employer would have expected that he was justified in discharging her. Therefore, the district court erred in finding that the defendants were qualifiedly immune from suit.

### B. Summary Judgment

The defendants urge that even if we find that they are not qualifiedly immune, we should hold that summary judgment was nevertheless proper under the *Mt. Healthy* test. Conner, however, contends that the case should go to trial because there are material factual issues in dispute. In reviewing a district court's grant of summary judgment, we may affirm on any ground

that finds support in the record. *Wallace v. Greer*, 821 F.2d 1274, 1277 (7th Cir.1987).

■ Under *Mt. Healthy City School District Board of Education v. Doyle*, 429 U.S. 274, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977), a plaintiff cannot prevail in her claim of retaliatory discharge if the defendant can show that the decision to terminate the plaintiff would have been reasonable even in the absence of the protected conduct. A plaintiff must show that her conduct was constitutionally protected and that this conduct was a substantial or motivating factor in the decision to terminate her. The burden then shifts to the defendant to prove that the plaintiff would have been discharged even if the protected conduct had not occurred. *Id.* at 287, 97 S.Ct. at 576.

■ Conner has met her burden of proving that her conduct at the Board of Ethics meeting was constitutionally protected. We must accept Conner's claim that she was merely voicing her personal opinion as to whether the taxpayers' money could be used for a particular purpose. Because that topic is a matter of public concern, it is entitled to first amendment protection. *See Pickering*, 391 U.S. at 571–72, 88 S.Ct. at 1736–37; *see also supra* note 3.

Conner must also show that her speech was a motivating factor in the defendants' decision to discharge her. The district court found that Conner was fired for insubordination because she insisted that she would do the same thing again. Thus, the district court accepted the defendants' argument that Conner was fired for refusing to take instructions, and that her conduct at the May 12th meeting was not a substantial factor in Reinhard's decision to fire her. However, as we noted earlier, there is a factual dispute as to whether Conner was defying legitimate instructions by her supervisor, or was merely reasserting her first amendment right to speak out on mat-

---

7. We do not mean to suggest that the fact that Conner was on duty at the time she spoke may not be highly relevant, especially to show whether she was insubordinate or whether her regular duties were disrupted. We merely hold that the fact that Conner was working *by itself* did not entitle her employer to retaliate against her for speaking about a matter of public interest in May 1982.

ters of public concern. The district court acknowledged the dispute, but nevertheless did "not believe that the difference in interpretation amount[ed] to a genuine issue of material fact." We disagree; the interpretation that the court accepts could determine whether or not Reinhard was justified in discharging Conner. This is indeed a genuine issue of material fact that we must leave to the fact-finding expertise of a jury.

Even if we were to find that the undisputed facts viewed in the light most favorable to Conner indicated that her speech was a substantial factor in Reinhard's decision to terminate her, we would then need to determine whether Reinhard had any other sufficient reason to discharge Conner. The parties, however, strongly disagree as to whether Reinhard had any justification for firing Conner other than the events related to the Board of Ethics meeting. Because the parties contest the the proper interpretation of Conner's reply to Reinhard's letter of reprimand and Reinhard's motivation in deciding to discharge Conner, the district court's grant of summary judgment cannot be sustained. *See DeValk Lincoln Mercury, Inc. v. Ford Motor Co.*, 811 F.2d 326, 329 (7th Cir.1987) (summary judgment improper where genuine issues of material fact exist).

### C. Claim Preclusion

■ The defendants also argue that Conner's earlier action against the City of Green Bay precludes her from bringing suit against them. Because Conner brought the earlier case against the city in federal district court, the federal rules of claim preclusion govern. *In re Energy Coop., Inc.*, 814 F.2d 1226, 1230 (7th Cir.), *cert. denied,* —— U.S. ——, 108 S.Ct. 294, 98 L.Ed.2d 254 (1987). For the doctrine to apply, three elements must exist: (1) an identity of the parties or their privies; (2) an identity of the causes of action; and (3) a final judgment on the merits. *Id.* (citing *Federated Dep't Stores, Inc. v. Moitie*, 452 U.S. 394, 398, 101 S.Ct. 2424, 2427, 69 L.Ed.2d 103 (1981)).

■ The defendants contend that the parties to the separate actions, while not identical, are in privity with one another. In the earlier suit, Conner sued the City of Green Bay. In the present action, however, Conner is suing two city officials in their personal capacities.[8]

An official-capacity suit is really just another way of suing the government. *See Beard v. O'Neal*, 728 F.2d 894, 897 (7th Cir.), *cert. denied,* 469 U.S. 825, 105 S.Ct. 104, 83 L.Ed.2d 48 (1984). Therefore, a city official sued in his official capacity is generally in privity with the municipality. *Lee v. City of Peoria*, 685 F.2d 196, 199–200 n. 4 (7th Cir.1982); C. Wright, A. Miller & E. Cooper, Federal Practice and Procedure § 4458, at 506 (1981).

---

**8.** In her complaint, Conner asked for "judgment against the defendants, individually and collectively." The terms "personal capacity" or "official capacity" do not appear in the complaint. In plaintiff's brief on appeal, however, Conner claims that she is suing the defendants "in their individual and official capacity [sic]."

This court has repeatedly encountered ambiguous pleadings that do not clearly indicate whether an official is being sued in his official or personal capacity. To dispel some of the confusion, we created a presumption that a section 1983 claim against a public official is an official-capacity suit. *Kolar v. County of Sangamon*, 756 F.2d 564, 568 (7th Cir.1985). While the *Kolar* presumption is a useful tool to aid judges, it is not conclusive. *See Duckworth v. Franzen*, 780 F.2d 645, 649 (7th Cir.1985), *cert. denied,* —— U.S. ——, 107 S.Ct. 71, 93 L.Ed.2d 28 (1986). A court must also consider the manner in which the parties have treated the suit. *Shockley v. Jones*, 823 F.2d 1068, 1071 (7th Cir.

1987). *See Kentucky v. Graham*, 473 U.S. 159, 167 n. 14, 105 S.Ct. 3099, 3106 n. 14, 87 L.Ed.2d 114 (1985); *Brandon v. Holt*, 469 U.S. 464, 469–71, 105 S.Ct. 873, 876–78, 83 L.Ed.2d 878 (1985).

The parties to the present action clearly consider this suit as one seeking to impose personal liability upon the defendants. The defendants have raised the defense of qualified immunity, a defense that is only applicable in a personal-capacity suit. *Graham*, 473 U.S. at 166–67, 105 S.Ct. at 3105–06. The plaintiff does not assert that the defendants followed a policy or custom of the City of Green Bay, a necessary showing in an official-capacity suit. *Id.* at 166 & n. 12, 105 S.Ct. at 3105–06 & n. 12. In addition, the plaintiff has named the estate of Richard Zolper as a defendant, which would be completely unnecessary in an official-capacity suit. *Id.* at 166 n. 11, 105 S.Ct. at 3105 n. 11. Therefore, we will honor the parties' obvious intentions and treat this suit as one alleging personal liability of the defendants.

A government official sued in his personal capacity, however, presents a different case. If the plaintiff prevails against the official, the official must satisfy the judgment out of his own pocket, rather than having the government entity pay the damages. *See Kentucky v. Graham,* 473 U.S. 159, 166, 105 S.Ct. 3099, 3105, 87 L.Ed.2d 114 (1985). In addition, different legal theories may be necessary to prove liability in a personal-capacity, as opposed to an official-capacity, case. Also, different defenses are available to a defendant who is sued in his personal capacity. *Id.* at 166–67, 105 S.Ct. at 3105–06. Therefore, courts do not generally consider an official sued in his personal capacity as being in privity with the government. *Headley v. Bacon,* 828 F.2d 1272, 1279 (8th Cir.1987); *Roy v. City of Augusta, Me.,* 712 F.2d 1517, 1521–22 (1st Cir.1983); *see Kunzelman v. Thompson,* 799 F.2d 1172, 1178 (7th Cir.1986); *see also* C. Wright, A. Miller & E. Cooper, Federal Practice and Procedure § 4458, at 508 (1981) ("The relationships between a government and its officials justify preclusion only as to litigation undertaken in an official capacity. Thus a judgment against a government does not bind its officials in subsequent litigation that asserts a personal liability against the officials.").

The Seventh Circuit has also taken this approach. For example, in *Beard v. O'Neal,* 728 F.2d 894 (7th Cir.), *cert. denied,* 469 U.S. 825, 105 S.Ct. 104, 83 L.Ed.2d 48 (1984), Beard sued FBI Agent Mitchell for damages relating to the murder of her brother. In a separate action, Beard also sued an FBI informant, Mitchell's supervisors, and the acting director of the FBI. This court rejected Beard's argument that all FBI officials are in privity for purposes of claim preclusion. Although we recognized that FBI agents sued in their official capacities would be in privity with each other, where government officials are sued in their personal capacities, privity does not exist. *Id.* at 897.

*Garza v. Henderson,* 779 F.2d 390 (7th Cir.1985), is a similar case, although it deals with the related doctrine of issue preclusion, rather than claim preclusion. The plaintiff in *Garza* originally brought a habeas corpus proceeding against the warden of a prison. The plaintiff subsequently initiated a civil rights action, naming as defendants members of a prison discipline committee. The committee members were sued in both their official and personal capacities. The plaintiff attempted to prevent the committee members from relitigating an issue that was decided in the earlier habeas action against the warden. This court, however, held that issue preclusion could not apply. Although both the warden and the committee members were officials of the federal government, the government was not the only litigant to the action. Rather, as we explained, "the [committee] members, who are being sued in their own individual capacities, are also separate and independent defendants in their own right." *Id.* at 394. Therefore, issue preclusion could not apply because the committee members did not have an opportunity to defend themselves in the earlier habeas action.

In support of their argument that privity between the city and the present defendants does exist, the defendants rely on *Mandarino v. Pollard,* 718 F.2d 845 (7th Cir.1983), *cert. denied,* 469 U.S. 830, 105 S.Ct. 116, 83 L.Ed.2d 59 (1984). In *Mandarino,* the plaintiff sued the Village of Lombard in Illinois state court. The plaintiff later brought a federal action against the village, the village mayor, the village manager, and several trustees of the village, suing the individuals in both their official and personal capacities. The defendants in the federal action claimed that the earlier state court judgment in favor of the village barred the federal suit under the principles of claim preclusion. This court agreed. On the issue of privity, we stated: "A government and its officers are in privity for purposes of res judicata." *Id.* at 850. The court then cited *Sunshine Anthracite Coal Co. v. Adkins,* 310 U.S. 381, 60 S.Ct. 907, 84 L.Ed. 1263 (1940); *Church of the New Song v. Establishment of Religion on Taxpayers Money,* 620 F.2d 648 (7th Cir.1980), *cert. denied,* 450 U.S.

929, 101 S.Ct. 1387, 67 L.Ed.2d 361 (1981); and *Lambert v. Conrad,* 536 F.2d 1183 (7th Cir.1976).

Those cases, however, do not hold that officers sued in their personal capacities are in privity with the government. Courts have distinguished *Sunshine Anthracite Coal* as actually referring to the doctrine of issue preclusion, which does not require the same mutuality of parties that is necessary for claim preclusion. *See Beard v. O'Neal,* 728 F.2d at 897; *Headley v. Bacon,* 828 F.2d at 1277. In addition, the *Church of the New Song* and *Lambert* opinions did not indicate whether the officials in those cases were sued in their personal or official capacities, and therefore did not directly address the question of privity between a government entity and officials sued in their personal capacities.

To the extent that the *Mandarino* opinion suggests that officials sued in their personal capacities are necessarily in privity with the government, we cannot agree. In *Mandarino,* however, the court was required to apply the claim preclusion laws of Illinois in deciding whether the earlier Illinois judgment would have preclusive effect in the later federal action. *Allen v. McCurry,* 449 U.S. 90, 96, 101 S.Ct. 411, 415, 66 L.Ed.2d 308 (1980); *Lee v. City of Peoria,* 685 F.2d at 198. In addition to the *Sunshine Anthracite Coal, Church of the New Song,* and *Lambert* cases, the *Mandarino* court cited two Illinois cases to support its proposition that the village officials were in privity with the village. *See Mandarino,* 718 F.2d at 850 (citing *Consolidated Distilled Prods. v. Allphin, Inc.,* 73 Ill.2d 19, 382 N.E.2d 217, 21 Ill.Dec. 853 (1978), and *City of Elmhurst v. Kegerreis,* 392 Ill. 195, 64 N.E.2d 450 (1946)). Because the *Mandarino* court was applying Illinois law, *Mandarino* is not controlling in this case where we must apply federal rules of claim preclusion.

Conner is suing the defendants in their personal capacities. Under federal law, we find that they are not in privity with the City of Green Bay. Therefore, Conner's earlier suit against the city does not preclude her from pursuing the present action.

### D. *Liability of Defendant Zolper*

Finally, Conner asserts that the district court erred in concluding that there was insufficient evidence to hold defendant Zolper liable for Conner's dismissal. In its order granting summary judgment, the district court found that "there is no basis for any cause of action against Zolper, except for the unsupported speculation of Conner that he went into Reinhard's office, slammed the door, and began to talk about her."

In her motion for reconsideration, the plaintiff directed the district court's attention to the testimony of Sheila Cody O'Connor. At the earlier trial against the City of Green Bay, O'Connor testified to a conversation she had had with defendant Reinhard a few days after the Board of Ethics meeting. O'Connor stated that Reinhard told her Zolper had visited him that morning and was upset with Conner's behavior at the May 12th meeting. Reinhard said that Zolper wanted Conner fired, and if she was not fired, Zolper would have her position eliminated at budget time. Although O'Connor claims that Conner was also present, Conner does not recall this conversation. The district court denied Conner's motion for reconsideration.

■ In reviewing a grant of summary judgment, we must review the undisputed facts, drawing all reasonable inferences in the light most favorable to the nonmovant. *Donald v. Polk County,* 836 F.2d 376, 379 (7th Cir.1988); *see Munson v. Friske,* 754 F.2d 683, 690 (7th Cir.1985) ("If a study of the record reveals that inferences contrary to those drawn by the trial court might be permissible, then the summary judgment should be reversed."). Although Conner does not remember the conversation between Reinhard and O'Connor, the defendants do not dispute that the conversation took place. Viewed in the light most favorable to Conner, O'Connor's testimony tends to show that Zolper may have been a motivating force in Reinhard's later decision to discharge Conner. For liability under section 1983, direct participation by a defendant is not necessary. Any official who

"causes" a citizen to be deprived of her constitutional rights can also be held liable. The requisite causal connection is satisfied if the defendant set in motion a series of events that the defendant knew or should reasonably have known would cause others to deprive the plaintiff of her constitutional rights. *Tidwell v. Schweiker*, 677 F.2d 560, 569 (7th Cir.1982), *cert. denied*, 461 U.S. 905, 103 S.Ct. 1874, 76 L.Ed.2d 806 (1983); *Johnson v. Duffy*, 588 F.2d 740, 743–44 (9th Cir.1978).

In *Soderbeck v. Burnett County, Wisconsin*, 752 F.2d 285 (7th Cir.), *cert. denied*, 471 U.S. 1117, 105 S.Ct. 2360, 86 L.Ed.2d 261 (1985), a plaintiff brought suit under section 1983, alleging that she was discharged from her job in the sheriffs office in violation of her first amendment rights. The defendants included the county sheriff, three members of the county law enforcement committee, and the county itself. The district court directed a verdict for the committee members on the ground that the committee had no legal authority to fire the plaintiff. We reversed and held that it was immaterial whether the committee members could legally discharge the plaintiff. The relevant inquiry was whether the jury could reasonably find that the committee members participated in the unconstitutional discharge. *Id.* at 293. Because we found that the jury could reasonably have found that the committee ratified the sheriff's decision to unlawfully discharge the plaintiff, the case was remanded for a new trial. *Id.* at 294.

Similarly, in *Miller v. City of Mission, Kansas*, 705 F.2d 368 (10th Cir.1983), a plaintiff sued under section 1983, claiming that he was discharged from his job as a city policeman in violation of his constitutional rights. The plaintiff named as defendants the mayor and several city council members. The Tenth Circuit found that the city council members could be held individually liable for plaintiff's unconstitutional discharge if they either directly participated in the termination process or set in motion a series of acts by others that they reasonably should have known would result in the plaintiff's unconstitutional dismissal. *Id.* at 375. Although the mayor

was the official who actually discharged the plaintiff, the court found that "the mayor would not have dismissed [the plaintiff] without a hearing absent the support and encouragement of defendant council members." *Id.* at 376. Thus, the plaintiff had a sufficient basis on which to hold the council members liable.

■ If the jury accepts as true the testimony of O'Connor, they reasonably could find that defendant Zolper motivated Reinhard's decision to discharge Conner. The defendants point out that, while a letter of reprimand followed Zolper's visit, Reinhard did not decide to terminate Conner until her defiant answer that she would do the same thing again. This takes us back to the disputed interpretation of Conner's remark. Whether Reinhard was responding to Zolper's pressure and decided to terminate Conner because she insisted that she would not cease exercising her first amendment rights is an issue of fact for the jury. Drawing all reasonable inferences in the light most favorable to Conner, we cannot say that Zolper is entitled to summary judgment as a matter of law. Because a jury could reasonably find Zolper liable for Conner's discharge, we reverse the grant of summary judgment as to defendant Zolper. *See Munson*, 754 F.2d at 690 (summary judgment proper only if no reasonable jury could return a verdict for the plaintiff).

### III. CONCLUSION

We find that the district court erred in granting summary judgment for the defendants on the basis of qualified immunity. Because there are material factual issues in dispute, we must remand this case for trial. We also find that the doctrine of claim preclusion does not bar Conner from pursuing this action. Finally, we reverse the district court's grant of summary judgment as to defendant Zolper.

REVERSED AND REMANDED.

CUDAHY, Circuit Judge, concurring in the result:

I agree with the decision to reverse the summary judgment for the defendants in

this case and with most of the majority's reasoning en route to this result. I disagree, however, with the majority's treatment of the insubordination question. The majority seems to assess Conner's response to Reinhard's letter as if the only question before us were whether Reinhard is entitled to summary judgment on the merits under *Mt. Healthy City School District Board of Education v. Doyle*, 429 U.S. 274, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977). In my view, the district court's decision (mem. op. at 1, 5–8 (Mar. 26, 1987)), and the parties' arguments on appeal (Brief of Defendants–Appellees at 19–20) also present a more difficult question: whether, accepting that a jury could find a constitutional violation on the facts pleaded by Conner, Reinhard's contention that he fired Conner for insubordination after the meeting rather than for her speech during the meeting entitles him to qualified immunity.

The qualified immunity question is difficult because *Mt. Healthy* apparently requires an investigation whether permissible motives for firing an employee were sufficient, in the mind of the defendant, to bring about the plaintiff's termination. 429 U.S. at 285–87, 97 S.Ct. at 575–76; *Nekolny v. Painter*, 653 F.2d 1164, 1166–68 (7th Cir. 1981), *cert. denied*, 455 U.S. 1021, 102 S.Ct. 1719, 72 L.Ed.2d 139 (1982). The Supreme Court has indicated that qualified immunity claims are to be tested under a purely objective standard, *Harlow v. Fitzgerald*, 457 U.S. 800, 815–19, 102 S.Ct. 2727, 2736–39, 73 L.Ed.2d 396 (1982); but it "has not explained how this objective standard is to be employed when the plaintiff's claim depends on the state of mind of the defendant." *Benson v. Allphin*, 786 F.2d 268, 276 n. 19 (7th Cir.), *cert. denied*, —— U.S. ——, 107 S.Ct. 172, 93 L.Ed.2d 109 (1986).

The courts of appeals for the Ninth and District of Columbia Circuits, however, have confronted qualified immunity defenses in section 1983 cases involving allegations of unconstitutional motives. Both have determined that where the legality of the actions of a section 1983 defendant depends upon the defendant's motive or intent, the qualified immunity inquiry cannot be confined to a purely objective view of a defendant's actions. *Gutierrez v. Municipal Court*, 838 F.2d 1031, 1049–51 (9th Cir.1988) (intentional discrimination on the basis of race); *Martin v. District of Columbia Metro. Police Dep't*, 812 F.2d 1425, 1431–33 (D.C.Cir.1987) (malicious prosecution);[1] *Hobson v. Wilson*, 737 F.2d 1, 26–29 (D.C.Cir.1984) (conspiracy to violate first amendment rights of political protesters), *cert. denied*, 470 U.S. 1084, 105 S.Ct. 1843, 85 L.Ed.2d 142 (1985); *see also Goodwin v. Circuit Court*, 729 F.2d 541, 546 (8th Cir. 1984) (upholding district court refusal to give qualified immunity instruction in case involving claim of "invidious sex discrimination").[2]

I believe that the case before us requires us to decide how *Harlow* applies to section 1983 claims that raise issues of illegal intent. Following the well-reasoned decisions of the Ninth and District of Columbia Circuits, I would conclude that Conner's specific allegations that impermissible mo-

---

1. Soon after *Martin* was decided, the D.C. Circuit granted rehearing en banc and vacated part IV of the majority opinion, which discussed plaintiff's burden to support allegations of illegal motive with specific facts and the availability of discovery against government officials to obtain the necessary facts. *Martin v. District of Columbia Metro. Police Dep't*, 817 F.2d 144 (D.C.Cir.1987). Subsequently, however, the court reversed its decision to grant rehearing en banc and restored part IV of the original decision. *Barlett ex rel. Neuman v. Bowen*, 824 F.2d 1240 (D.C.Cir.1987).

2. *Miller v. Solem*, 728 F.2d 1020 (8th Cir.), *cert. denied*, 469 U.S. 841, 105 S.Ct. 145, 83 L.Ed.2d 84 (1984), held that an entirely objective test could be applied to an eighth amendment claim of deliberate indifference. *Id.* at 1025. *Compare Albers v. Whitley*, 743 F.2d 1372, 1376 (9th Cir.1984) (objective test for qualified immunity unavailable where plaintiff alleges deliberate indifference), *rev'd on other grounds*, 475 U.S. 312, 106 S.Ct. 1078, 89 L.Ed.2d 251 (1986). The Eighth Circuit adhered to an "objective" approach by evaluating the defendant's qualified immunity claim under a "reckless disregard" standard—a close analog to deliberate indifference. *Miller*, 728 F.2d at 1025. No such objective substitute suggests itself for the intent elements of intentional discrimination, malicious prosecution, and conspiracy, the claims addressed in the Ninth and District of Columbia Circuit cases cited in the text.

tives were essential to Reinhard's discharge decision preclude summary judgment on qualified immunity grounds. I therefore arrive at the same outcome as the majority, though via a somewhat longer and rockier route.