Herbert NOWAK, Plaintiff,

v.

Frank SZWEDO and Richard Julien, Defendants.

No. 88 C 5766.

United States District Court, N.D. Illinois, E.D.

Jan. 11, 1989.

## MEMORANDUM OPINION AND ORDER

PLUNKETT, District Judge.

Plaintiff Herbert Nowak brings suit against Defendants Frank Szwedo and Richard Julien under 42 U.S.C. § 1983 for alleged violations of his rights under the First and Fourteenth Amendments. Defendants have moved to strike and dismiss the complaint. For the reasons set forth below, the motion is granted in part and denied in part.

### Allegations of the Complaint

The complaint alleges the following. Plaintiff is a paramedic with the Chicago

Fire Department. Defendant Szwedo is Director of the Inspections and Auditing Division ("IAD") of the Fire Department, and Defendant Julien is Assistant Director of IAD. In February 1983 Plaintiff became active in the mayoral campaign of the late Harold Washington. Szwedo and Julien were active supporters of then-mayor Jane Byrne. In April 1983 Plaintiff co-authored and submitted to the mayor's office recommendations entitled respectively "Elimination of Monetary Waste in the CFD" and "Elimination of Monetary Waste in CFD's Emergency Medical Service." In June 1983, Plaintiff co-authored and submitted to the mayor's office additional reports entitled respectively "Continued Recommendations for the Elimination of Monetary Waste and Inefficiency in the CFD" and "Summary of the CFD Paramedic Lawsuit."

As a result of Plaintiff's recommendations regarding the elimination of waste in the running of the CFD, Defendants began to harass Plaintiff.[1] The harassing incidents are as follows.

1. On October 26, 1983, Defendants confronted Plaintiff in the file room of the Quinn Fire Academy. In discussing Plaintiff's job performance, they characterized his attitude with obscenities and attacked him personally. They told Plaintiff to "clean up his act" and "do more than he was doing to protect his position," and engaged in verbal outbursts. Julien told Plaintiff that "if you should be expecting a promotion in the near future, you well better tell me about it. If you don't, I'll do my best to block it if I can."

2. On February 16, 1984 Julien interrogated Plaintiff regarding the length of time Plaintiff was spending in the IAD office.

3. On July 13, 1984, Szwedo accosted Plaintiff and threatened him with ejection from the IAD office. Szwedo told Plaintiff that he had good information that Plaintiff was trying to "overthrow his position" as Director and that he had a "bad attitude." He also informed Plaintiff that he should seriously consider which ambulance he wanted to be assigned to, but that he would not necessarily get that assignment.

4. In the spring of 1985, Plaintiff was assigned to conduct surveillance on a retired fireman who was allegedly shaking down storefronts in Chicago. Plaintiff thought that this investigation was outside the realm of IAD, but was told by Defendants to do his job.

5. On April 22, 1986 Szwedo told Plaintiff to call a detective regarding a particular investigation. When Plaintiff forgot to call the detective, Szwedo "went into a tirade and chased Plaintiff around his office yelling at him." On April 23, Szwedo confronted Plaintiff regarding the events of the previous day. Szwedo told Plaintiff that Plaintiff showed nothing but contempt for Szwedo and Szwedo's position, and told Plaintiff to do his work but nothing else. Szwedo also stated that he knew Plaintiff had wanted to strike him the day before. (In fact, Plaintiff was told by Carol Falcon, who witnessed the confrontation, that she thought Szwedo was going to strike Plaintiff). Szwedo offered to send Plaintiff into the field and stated that a report would be placed in Plaintiff's file, yet "again stated" that he had no complaints about Plaintiff's work. Szwedo did not issue a Disciplinary Register Number in the report, "which is outside the disciplinary process of the CFD."

6. On July 11, 1986, Plaintiff was informed that a special investigation had been initiated against him as a result of requested overtime for being detailed to Grant Hospital. Plaintiff was told by Julien that he did not need overtime forms, yet Julien questioned the correctness and reasonableness of the overtime when Plaintiff submitted his request.

7. On an unspecified date, Plaintiff investigated a case in which an ambulance arrived too late to save a patient, and

---

1. The complaint nowhere alleges that Plaintiff's support of Harold Washington had anything to do with the alleged harassment. Indeed, the court is rather puzzled, then, as to why the allegations regarding Plaintiff's and Defendants' contrasting political affiliations are even included in the complaint.

found that the ambulance had gotten lost on the way to the call. Emergency Medical Services did not approve the case against the ambulance. When Plaintiff suggested a possible cover-up to Defendants, they ignored Plaintiff's concern and told him that "That's the way it is."

8. At unspecified times, Plaintiff offered opinions contrary to those of Defendants at office meetings. His opinions were met with scorn. As a result, "Plaintiff would not contribute to office meetings and would also not be invited to such meetings by Defendants."

9. In October 1986, Plaintiff was assigned to the 4th District, where the number of calls is greater, the neighborhood tougher, the working conditions worse than in other districts, and which is likely to have personnel who would "frown upon" a former IAD investigator. Plaintiff was assigned to this district despite Szwedo's promises that Plaintiff could pick his assignment when he left IAD. Plaintiff also failed to receive a raise which he had been promised. While in the 4th District, Plaintiff did not have an assignment and was exposed to a different firehouse and different personnel every day.

Plaintiff asserts that the actions of Defendants were taken in retaliation for his submitting written recommendations regarding waste in the CFD, and were undertaken in their capacities as City of Chicago officials and under color of law. Plaintiff contends that as a result of these actions, he has lost income, been held up to public ridicule and ostracized by his fellow employees, has suffered severe mental and emotional distress, and has been foreclosed from pursuing career opportunities with the CFD. Plaintiff seeks $1,000,000 in damages and an injunction prohibiting further harassment.

*Discussion*

Defendants seek dismissal of the complaint on the following grounds: 1) failure to state a claim upon which relief may be granted, 2) qualified immunity, and 3) statute of limitations. We shall now examine each of these grounds.[2]

*Failure to State a Claim*

■ Defendants assert that F.R.Civ.P. 12(b)(6) demands dismissal of this action because the alleged harassment was too trivial in nature and in any event occurred too long after Plaintiff's exercise of his free speech rights to be causally related to that exercise. We reject both these arguments.

The argument regarding the triviality of the harassing actions must be rejected in light of *Bart v. Telford*, 677 F.2d 622 (7th Cir.1982). In *Bart*, plaintiff alleged that defendants "orchestrated a [retaliatory] campaign of petty harassments" which included baseless reprimands and " '[h]olding her up to ridicule for bringing a birthday cake to the office on the occasion of the birthday of another employee although the practice was common and was especially favored in the case of supervisory personnel.' " *Id.* at 624. The district court dismissed the complaint for failure to state a claim, but the Seventh Circuit reversed. Judge Posner, writing for the panel, stated that

> It is true that a certain air of the ridiculous hangs over the harassment allegations, in particular the allegation that we quoted earlier regarding the birthday cake. But we cannot say as a matter of law that the exercise of First Amendment rights by public employees cannot be deterred by subjecting employees who exercise them to harassment and ridicule through selective enforcement of work rules.

*Id.* at 625. The court went on to explain that a campaign which is "trivial in detail

2. Defendants' motion also claimed that this suit is barred by res judicata. The argument was based on this court's dismissal for want of prosecution of a similar lawsuit previously filed by Plaintiff. *See Nowak v. Szwedo*, 87 C 9609, Minute Order, Mar. 22, 1988. However, we do not consider this argument as Defendant now appears to concede that the court later made clear that the dismissal of the earlier lawsuit was without prejudice. *See* Def. Reply at 12 n. 5 (acknowledging court's April 25, 1988 statement in open court that dismissal was without prejudice).

may [be] substantial in gross," and found that the question of whether such a campaign rises to the level of actionability under Section 1983 is a question of fact. *Id.* We find, similarly, that the question whether the series of comparatively low-level harassing events detailed in Plaintiff's complaint rises to an actionable level is not appropriately determined at the pleading stage. Moreover, we also believe that the issue of causality is one of fact which must await resolution on summary judgment or at trial. Accordingly, we shall not dismiss the complaint on grounds of failure to state a claim.

### Qualified Immunity

■ Having determined that the complaint states a claim upon which relief may be granted, we now move to a consideration of whether Defendants are nevertheless immune from civil damages under the doctrine of qualified immunity. In *Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396 (1982), the Supreme Court held that "government officials performing discretionary functions, generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." A right is clearly established when "[t]he contours of the right [are] sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Anderson v. Creighton,* 483 U.S. 635, 107 S.Ct. 3034, 3039, 97 L.Ed.2d 523 (1987). As explained by the Seventh Circuit:

> The right must be sufficiently particularized to put potential defendants on notice that their conduct probably is unlawful. . . . [T]he test for immunity should be whether the law was clear in relation to the specific facts confronting the public official when he acted.

*Conner v. Reinhard,* 847 F.2d 384, 388 (7th Cir.1988) (citations omitted). More specifically, this circuit requires caselaw which "clearly and consistently recognized the constitutional right." *Id.* (citation omitted).

The cases need not involve the exact same fact pattern as the case being litigated, but case law in a closely analogous area is necessary to permit a court to find that the right was clearly established at the time of the alleged violation. *Id.* Plaintiff bears the burden of establishing the existence of the clearly established right. *Id.; Abel v. Miller,* 824 F.2d 1522, 1534 (7th Cir.1987); *Alvarado v. Picur,* 859 F.2d 448, 452 (7th Cir.1988).

Defendants claim that qualified immunity relieves them of liability because at the time of their alleged actions there was no established case law upholding a First Amendment claim for retaliation as petty and far removed in time from the exercise of First Amendment rights as that alleged in the complaint. In rebuttal, Plaintiff relies on two cases: 1) *Bart v. Telford, supra,* where the Seventh Circuit held that a retaliatory campaign of petty harassment may rise to the level of actionability under Section 1983, and 2) *McGill v. Board of Education,* 602 F.2d 774, 780 (7th Cir. 1979), where the Seventh Circuit held that a retaliatory transfer of a teacher to a school within the same district with no loss of pay, seniority or other rights violates the First Amendment.[3]

■ We find that Defendants are entitled to immunity from liability in so far as liability is premised on the theory that the series of harassing events outlined in the complaint cumulatively amounted to actionable retaliation. *Bart,* which was decided prior to all of Defendants' alleged actions, indeed held that a campaign of petty harassment *may* rise to an actionable level. However, neither *Bart,* nor any other authoritative case law of which we are aware, comes anywhere close to specifying the factual ingredients of the type of "campaign of harassment" which violates the constitution. As explained above, Defendants are entitled to immunity unless the law was sufficiently clear *in relation to the facts confronting them* to put them on notice that their actions were probably unlawful. Given the uncertain state of the

---

**3.** Aside from the transfer, Plaintiff does not contend that any of Defendants' actions, standing alone, violated clearly established constitutional rights.

law, Defendants had no such notice, and therefore are entitled to qualified immunity with respect to liability on a "campaign of harassment" theory.

■ We also find, however, that Defendants are not immune from liability for damages for the alleged retaliatory transfer to the 4th District. In *McGill, supra,* decided in 1979, the Seventh Circuit held that transferring an employee against her will in retaliation for her exercise of First Amendment rights violates the constitution even where no loss of pay or seniority is incurred. Given *McGill,* Defendants were on notice that retaliatory transfers are verboten. Defendants contend that immunity with regard to the transfer is nevertheless warranted because the transfer in this case did not take place until three and a half years after the protected activity, while the transfer in *McGill* followed close on the heels of the protected activity. We reject this argument, for the length of time between the exercise of free speech rights and the transfer is relevant only to the issue of causation, which we have found is a question of fact. While the time span between the two events will make more difficult plaintiff's task of proving the necessary causal link between the two, we cannot bar Plaintiff's retaliatory transfer claim on immunity grounds at this stage of the litigation simply because of the seeming weakness of Plaintiff's case on the causality element.

### Statute of Limitations

■ Given our disposition of the qualified immunity issue, which leaves standing only the retaliatory transfer claim,[4] the statute of limitations issue is greatly simplified. The appropriate statute for Section 1983 claims is Illinois' two-year limitations period for personal injury suits. *See Anton v. Lehpamer,* 787 F.2d 1141 (7th Cir. 1986).[5] The allegedly retaliatory transfer

took place in October 1986. Plaintiff's complaint in the first action was filed November 6, 1987, and the complaint in this action filed July 5, 1988. Regardless of which filing tolled the statute of limitations, the statute of limitations is not a bar to litigation regarding the transfer.

### Conclusion

For the foregoing reasons, Defendants' motion to strike and dismiss is granted in part and denied in part. The court finds that the complaint states a cognizable legal claim, but also finds that Defendants are entitled to qualified immunity in so far as Plaintiff's claim is based on a campaign of harassment. Qualified immunity does not, however, apply to the claim of retaliatory transfer, nor is that claim barred by the statute of limitations.

---

**4.** The court is not, of course, precluding the possibility that evidence concerning the earlier incidents may be admissible for purposes of establishing the motive for the transfer.

**5.** More precisely, the two-year rule applies to causes of action accruing subsequent to April

17, 1985, the date of the Supreme Court decision which definitively resolved the question of the applicable statute. The rule is more complex with regard to causes of action accruing prior to April 17, 1985. *See Anton,* 787 F.2d at 1146.