Albert GARZA, Plaintiff-Appellant,

v.

J.D. HENDERSON, S.R. Witkowski, George Wilkinson, R.M. Carey, and J.J. Clark, Defendants-Appellees.

No. 85–1167.

United States Court of Appeals, Seventh Circuit.

Argued June 6, 1985.

Decided Dec. 13, 1985.

As Corrected Dec. 17, 1985.

Howard B. Eisenberg, Carbondale, Ill., for plaintiff-appellant.

Richard H. Lloyd, Asst. U.S. Atty., Frederick J. Hess, U.S. Atty., East St. Louis, Ill., for defendants-appellees.

Before CUDAHY, COFFEY, Circuit Judges, and PELL, Senior Circuit Judge.

COFFEY, Circuit Judge.

The plaintiff, Albert Garza, an inmate at the Federal Penitentiary in Marion, Illinois, appeals the district court's decision granting summary judgment in favor of the defendants and dismissing his civil rights action. We affirm.

I

The record reveals that the plaintiff escaped from the United States Penitentiary at Marion, Illinois on February 14, 1979 and was captured three days later on February 17, 1979 following a gun battle. Al-

though the Sheriff of Johnson County, Illinois, was struck by a bullet, he escaped serious injury since the bullet hit his flak jacket; the plaintiff, however, was not as fortunate and was wounded in the exchange of gunfire. He was taken to the United States Medical Center for Federal Prisoners ("U.S.M.C.F.P.") in Springfield, Missouri where he convalesced from February 21 through April 21, 1979.

On April 2, 1979, while the plaintiff was still in the hospital, an incident report was issued by the Marion Penitentiary Institution Discipline Committee ("IDC") against Garza for a violation of Code 102 (escape) arising from Garza's February 14, 1979 escape. On April 4, 1979, the IDC held a hearing *in absentia* and found the plaintiff guilty of escape with violence. The IDC imposed sanctions against Garza that included "Disciplinary Segregation with review, increase custody to maximum, and a recommendation for placement in the Marion Control Unit."[1] On June 13, 1979, following his return from the hospital, the plaintiff attended a Control Unit hearing. The purpose of this hearing was to determine "whether the inmate can and would function in a general prison population without being or posing a threat to staff or others or to the orderly operation of the institution." 28 C.F.R. § 541.43(b)(4)(i) (1984). Prior to this hearing, Garza was provided with written notice of the hearing and was advised of his right to present witnesses on his behalf. At this hearing, Garza argued that he was not a threat to anyone in the institution. He further contended that since the violence in escaping from the prison "occurred ... outside the institution," this evidence should "not be used against him for placement in the Control Unit" since he was not a threat to the prison population while confined within the prison walls. At the hearing, Garza presented no witnesses, but did file various statements from individuals in the prison population and his supervisor in the prison kitchen stating that Garza did not present a threat to the safety of the staff or the inmates. After evaluating the evidence, the hearing examiner rejected Garza's defenses and ordered him placed in the Control Unit until he was able to "demonstrate that he could function in the open population without involving himself in activities which jeopardize the orderly and safe running of the institution."

In June, 1981, the plaintiff filed a petition for a Writ of Habeas Corpus naming the Warden at the Marion Penitentiary and the members of the IDC as defendants (these IDC defendants were subsequently dropped from the habeas action as they were improper defendants to the habeas action). Garza sought to have his disciplinary infraction and any mention of his placement in the Control Unit expunged from his prison record. He claimed that his constitutional rights were violated when the IDC members, the defendants in this civil rights action, failed to provide him with notice of the IDC hearing. The magistrate held a hearing on the habeas corpus petition at the prison and Garza testified that he failed to receive any notice of the IDC hearing. The government disputed this claim arguing that the plaintiff did in fact receive notice of the IDC hearing, but that he refused to appear and thus waived any possible claim that his constitutional rights had been violated. To support this position, the government introduced in evidence a "Work Assignment Record" which included a notation made by an unknown source that the plaintiff "did not wish to have in-person IDC hearing." The magistrate, after weighing Garza's sworn testimony that the prison authorities failed to offer him the opportunity for an in-person hearing against the unverified statement on the Work Assignment Record, accepted Garza's testimony that he did not have the opportunity for an in-person hearing and granted Garza's petition for writ of habeas corpus. He further ordered all references to any disciplinary actions taken by the IDC expunged from Garza's prison record.

---

**1.** The Control Unit is a specified section of the prison set aside for prisoners that pose a threat to staff or other prisoners. 28 C.F.R. § 541.43(b)(4)(i) (1984).

While the habeas corpus action was proceeding, the plaintiff also commenced this civil rights action against the defendants— members of the IDC—alleging that "his right to prior notice of charges was ... violated ... when Defendants served no such notice" and that he was denied his "right to a fair and impartial hearing" since the "IDC held their hearing while Plaintiff was *in absentia* and imposed grievous sanctions upon plaintiff without allowing any presentation of evidence in his defense." [2]   The government moved for summary judgment and in support of its motion submitted the affidavit of Jeffrey Clark, the former assistant parole executive at the Marion, Illinois Penitentiary. Clark stated that upon Garza's return to the prison he (Garza) was "advised that he could have an 'In Person' hearing before the Institution Discipline Committee ... on the escape charge .... [but that] Garza advised the Committee that he did not wish to have an 'In Person' I.D.C. hearing." [3] Clark, in his affidavit, stated that he was the person who, on April 30, 1979, "initialed the entry" in the Work Assignment Record. Garza moved for partial summary judgment asserting that the defendants were collaterally estopped from relitigating the issue of whether or not he received the opportunity for an in-person hearing since this issue was previously litigated and settled in the habeas corpus action. In the alternative, Garza argued that the Government's motion for summary judgment should not be granted since the government had failed "to satisfy their burden of establishing a lack of a triable issue of fact." (Garza's Motion for Summary Judgment).

After reviewing the pleadings and affidavit supporting the defendants' motion for summary judgment the magistrate found that "any constitutional infirmity, real or imagined, was waived by plaintiff." The magistrate further found that the defendants could not be collaterally estopped from relitigating the issue of whether Garza received an opportunity for an in-person IDC hearing since the defendants in Garza's civil rights action were not defendants in Garza's habeas corpus action and thus they had not previously had a "full and fair" opportunity to litigate this issue. Thus, on January 3, 1985, the magistrate entered an order granting the defendants' motion for summary judgment.

On appeal, Garza contends that the magistrate erred when he refused to collaterally estop the defendants from contesting the issue of liability for the alleged violation of Garza's constitutional rights. In the alternative, Garza argues that the magistrate improperly granted summary judgment in favor of the defendants as there still remained an issue of fact as to whether he received an opportunity for an in-person IDC hearing.

## II

Garza contends that since the district court previously found in the habeas corpus action that his constitutional rights had been violated when he failed to receive an opportunity for an in-person IDC hearing, the defendants in this civil rights action should now be precluded from relitigating that issue again. In this civil rights action, Garza seeks to use collateral estoppel offensively to preclude the defendants from litigating the issue of liability for the alleged constitutional deprivation arising from Garza's alleged failure to receive an opportunity for an in-person IDC hearing.

■  Under the doctrine of collateral estoppel, "once an issue is actually and necessarily determined by a court of competent jurisdiction, the determination is conclusive in subsequent suits, based on a different

---

**2.** The plaintiff also alleged that he was denied a fair and impartial hearing since defendant Carey sat on the Institution Discipline Committee, and that he was denied his right to rebut adverse evidence introduced during the Control Unit hearing.  The district court also dismissed these counts in Garza's complaint.  On appeal,

Garza does not contest the magistrate's dismissal of these counts.

**3.** This affidavit does not disclose what prison official specifically advised Garza of his right to an IDC hearing.

cause of action, involving a party to the prior litigation." *Crowder v. Lash,* 687 F.2d 996, 1009 (7th Cir.1982); *Warren v. McCall,* 709 F.2d 1183, 1184 (7th Cir.1983). When a plaintiff seeks to collaterally estop a defendant from relitigating an issue, the plaintiff must establish: "(1) that the party against whom the estoppel is asserted was a *party to the prior adjudication,* (2) the issues which formed the basis of the estoppel were actually litigated and decided on the merits in the prior suit, (3) the resolution of the particular issues was necessary to the court's judgment, and (4) those issues are identical to the issues raised in the subsequent suit." *County of Cook v. Mid-Con Corp.,* 773 F.2d 892, 898–99 (7th Cir. 1985) (emphasis added). *See also Green v. Amerada Hess Corp.,* 707 F.2d 201, 205 (5th Cir.1983); *see generally* 18 C. Wright & A. Miller & Cooper, *Federal Practice and Procedure* § 4432 (1981). Further, the district court is entrusted with a broad range of discretion in assessing the propriety of the plaintiff's motion that seeks to use collateral estoppel offensively to preclude a defendant from relitigating an issue previously decided in another action. In *Parklane Hosiery Co. v. Shore,* 439 U.S. 322, 99 S.Ct. 645, 58 L.Ed.2d 552 (1979), the Supreme Court stated:

> "We have concluded that the preferable approach for dealing with these problems in the federal courts is not to preclude the use of offensive collateral estoppel, *but to grant court broad discretion to determine when it should be applied.*"

*Id.* at 331, 99 S.Ct. at 651 (emphasis added). In discussing whether a party in a subsequent action has had a "full and fair" opportunity to litigate an issue previously decided in an earlier action, the Supreme Court in *Blonder-Tongue Laboratories v. University of Illinois Foundation,* 402 U.S. 313, 91 S.Ct. 1434, 28 L.Ed.2d 788 (1971) stated:

> "Some litigants—those who never appeared in a prior action—may not be collaterally estopped without litigating the issue. They have never had a chance to present their evidence and arguments on the claim. Due process prohibits estopping them despite one or more existing adjudications of the identical issue which stands squarely against their position."

*Id.* at 329, 91 S.Ct. at 1443.

■ In this case, three of the four basic requirements for doctrine of collateral estoppel have been satisfied. The issue in the habeas corpus action and the issue in this civil rights action are the same—namely, whether Garza received an opportunity for an in-person IDC hearing. Further, this issue was actually litigated in the habeas corpus action and was necessary for the resulting judgment that Garza's constitutional rights had been violated. The first requirement—that "the party against whom the estoppel is being asserted was a party to the prior adjudication"—is not, however, satisfied. *County of Cook,* 773 F.2d at 898–99. Garza, however, argues that the "government was afforded every opportunity to litigate the issues in the habeas corpus case." To support this assertion he recites that the habeas corpus case came to trial approximately one year after this civil rights action was filed, and thus the government had notice of this action; further, Garza notes that the government attorney represented the defendants in both actions. Essentially, Garza argues that since the same government attorney represented the defendants in both actions—the warden in the habeas corpus case and the IDC members in this civil rights case—the defendant IDC members in this civil rights action should be precluded from relitigating the issue concerning whether Garza received an opportunity for an in-person IDC hearing.[4] Gar-

---

**4.** In *United States v. Mendoza,* 464 U.S. 154, 103 S.Ct. 568, 78 L.Ed.2d 379 (1984), the Supreme Court held that non-mutual offensive collateral estoppel cannot be used against the government. Mutuality exists when both parties, plaintiffs and defendants, participated in the previous action and were bound by the judgment. In *Mendoza,* different plaintiffs had sued the United States government in different actions. The court held that since the plaintiffs in the second action did not participate in the first action against the government, mutuality of parties did

za's argument overlooks one essential fact. In his complaint in this civil rights action he alleges that "all defendants are sued in their official and personal capacities." These defendants are not only being sued in their capacities as government employees, but are also being sued in their individual capacity. The mere fact that the United States Attorney represented the warden in the habeas corpus action and IDC members in this civil rights action does not establish that the government is the only litigant to this action. Rather, the IDC members, who are being sued in their own individual capacities, are also separate and independent defendants in their own right. The IDC members were not parties to the habeas corpus action (*see Wales v. Whitney,* 114 U.S. 564, 574, 5 S.Ct. 1050, 1054, 29 L.Ed. 277 (1885)), and did not participate in, much less control or effect the course of the habeas corpus action's defense.[5] These defendants did not have the opportunity to engage in any discovery or assert any defense that could shield them from liability.[6] Thus, since the members of the IDC are being sued in their individual capacities, notions of a fairness and basic due process dictate that these persons have an opportunity to defend this action in court. *Blonder-Tongue,* 402 U.S. at 329, 91 S.Ct. at 1443; *Whitley v. Seibel,* 676

F.2d 245, 248 n. 1 (7th Cir.), *cert. denied,* 459 U.S. 942, 103 S.Ct. 254, 74 L.Ed.2d 198 (1982).[7] Thus, we hold that the district court did not abuse its discretion in denying Garza's motion requesting that the defendants be collaterally estopped from denying liability in this case.

### III

Garza next contends that the district court improperly entered summary judgment for the defendants and dismissed his claim. In support of its motion for summary judgment, the government produced the affidavit of Jeffrey Clark, the former Chief of Classification and Parole/Executive Assistant at the Marion, Illinois Penitentiary. Clark, in his affidavit, stated that Garza was advised that an IDC hearing was held *in abstentia* concerning his escape; he also notes that Garza was advised that he could have an "in person" hearing before the IDC on the escape charges but that Garza declined this offer. Clark also notes that he was the person who documented this fact on the Work Assignment Record. In opposition to the government's motion for summary judgment, Garza submitted his own affidavit stating after he was informed that an IDC hearing had been held *in abstentia,* he demanded an in-person

not exist and thus the plaintiff could not collaterally estop the government from contesting the issue of liability. In this case, the same plaintiff, Garza, participated in both actions; however, the defendant in the habeas corpus action (the warden representing the United States) is different from the defendants in this civil rights action (the members of the IDC sued in both their individual and official capacities). However, even if one would consider the government to be the only defendant in these two actions, such that mutuality would exist between the parties in both actions, application of offensive collateral estoppel is still within the discretion of the district court.

5. This can be seen in this civil rights action as the IDC members' defense was much more rigorous in protecting their rights as evidenced by the submission of Jeffrey Clark's affidavit. In his affidavit Clark asserts that Garza was informed that he could have an in-person IDC hearing that he declined this offer.

6. Even if we were to assume that the defendants were precluded from relitigating the issue of

whether Garza's due process rights were violated, this would not preclude the defendants from relitigating the issue of whether the due process violation "caused" Garza's injuries. This issue will be discussed in the next section of this opinion.

7. Further, as stated in the *Parklane Hosiery Co.,* decision:

"A second argument against offensive use of collateral estoppel is that it may be unfair to a defendant. If a defendant in the first action is sued for nominal damages, he may have little incentive to defend vigorously, particularly if future suits are not foreseeable."

*Parklane Hosiery Co.,* 439 U.S. at 330, 99 S.Ct. at 651. In this case, the stake in defending the previous habeas corpus action, where Garza sought to simply expunge his record, was nominal when compared to the stakes in this civil rights action where Garza seeks a substantial monetary award. *See Crowder v. Lash,* 687 F.2d 996, 1011 (7th Cir.1982).

hearing but his demand was denied. Garza also noted that his testimony in the habeas corpus actions directly refuted the Clark affidavit. Relying on Clark's affidavit, the magistrate found that "any constitutional infirmity, real or imagined, was waived by plaintiff."

Pursuant to Federal Rule of Civil Procedure 56(c), summary judgment is appropriate when "on the basis of the pleadings and supporting documents, there remains no material issue of fact to be tried ... [s]ummary judgment is appropriate only if it appears that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Moore v. Marketplace Restaurant, Inc.,* 754 F.2d 1336, 1339 (7th Cir.1985) (citations omitted). Under this well accepted standard, summary judgment is not to be entered when a material question of fact exists.

■ Here, Clark's and Garza's affidavits are in direct conflict as to whether Garza was in fact offered the opportunity of an in-person hearing. Thus, the record clearly reveals that a question of fact exists concerning whether Garza refused an in-person hearing before the IDC. This disputed question of fact was material since due process requires that prisoners receive written notice of a rule infraction in advance of disciplinary action so that the prisoner is "informed of the charges to enable him to ... prepare a defense." *Wolff v. McDonnell,* 418 U.S. 539, 564, 94 S.Ct. 2963, 2979, 41 L.Ed.2d 935 (1974). If Garza was deprived of the opportunity to appear before the IDC to defend himself, this deprivation certainly is material to the consideration of determining whether or not his due process rights were violated. Since Garza's and Clark's affidavits conflicted as to whether Garza received an opportunity for an in-person IDC hearing, entry of summary judgment on the basis that Garza had waived his right to an IDC cannot be sustained. It is within this court's power, however, to affirm the district court on other grounds if we determine that the grant of summary judgment

was proper. *Oyler v. National Guard Ass'n of the United States,* 743 F.2d 545, 555 (7th Cir.1984). Garza claims that he suffered emotional distress, anxiety and physical and psychological deterioration as a result of his being placed in the Control Unit. He was placed in the Control Unit after he received a separate hearing conducted by an independent Control Unit examiner. The examiner's finding that Garza should be placed in the Control Unit was based in part upon the IDC's recommendation he be placed in this unit. For purposes of our analysis, we will assume Garza did not in fact receive an opportunity for an in-person IDC hearing and that this failure to receive an IDC hearing amounted to a denial of due process under the Fifth Amendment. Even so, from this record we are of the opinion that Garza cannot establish any causal connection between his alleged injuries and the alleged denial of an opportunity for an in-person IDC hearing.

It is well established that "[a] section 1983 action is a tort damage action even though the duty the defendant is alleged to have breached is created by the Constitution or federal law." *Benson v. Cady,* 761 F.2d 335, 339 (7th Cir.1985). As in a common law tort action, the plaintiff in a civil rights tort action bears the burden of establishing that the defendant owed the plaintiff a duty, that the defendant breached his duties to the plaintiff, and that this breach caused the plaintiff actual damages. *Id.* The record reveals that Garza cannot establish, as a matter of law, the requisite causal connection between the alleged constitutional deprivation and his injury. This case is similar to *Lossman v. Pekarske,* 707 F.2d 288 (7th Cir.1983), where we held that the plaintiff had failed to establish that the alleged due process violation caused him any injury. In *Lossman,* on March 28, 1980, police and county officials in Wisconsin temporarily placed the plaintiff's children in a foster home after the officials had received a report that plaintiff was abusing his children. On that same day, pursuant to Wis.Stat. § 48.19(1)(c), the County prosecutor obtained an *ex parte* order from the judge approving of the removal of the children from the plaintiff's

home. The plaintiff claimed that his constitutional rights were violated when the state failed to make any effort to notify him of this March 28th hearing resulting in the temporary removal of his children from his custody. A hearing was subsequently held on April 9, 1980, at which time the plaintiff appeared and the court determined that the children should continue to reside in the foster home. On May 7, 1980, pursuant to an agreement between the state and the plaintiff, his children were returned to him. In *Lossman,* we determined that even if the plaintiff was not properly notified of the March 28th hearing, it would not have made any difference in the outcome of the plaintiff's civil rights action.

"Since whether or not he received due process on March 28, Lossman would have in all probability have lost custody of the children on that day, the alleged denial of due process was not a necessary condition, or *'but for' cause,* of the separation of his children from father on which the claim for damages is based.

So plaintiffs have failed to establish a cause connection between the alleged denial of due process and any injury resulting from removal of the children from Lossman's custody; and the principles of tort causation apply to constitutional as to other tort suits.... Consistently with those principles, the Supreme Court held in *Carey v. Piphus,* 435 U.S. 247, 98 S.Ct. 1042, 55 L.Ed.2d 252 (1978), that general damages (i.e. damages not based on proof of actual injury) cannot be awarded in a suit alleging denial of due process in its primary sense—which is the sense that the plaintiffs here invoke—of fair procedure. *It is not enough for plaintiff to show that he should have had a hearing of a particular sort; he must show, with some degree of probability, that such a hearing would have prevented the deprivation of which he complains.* Otherwise the failure to provide the hearing did not injure him; and tort damages cannot be awarded if there is no injury."

*Lossman,* 707 F.2d at 291 (emphasis added).

A review of the record and the regulations governing present disciplinary procedures disclose in all probability that even if Garza had received an in-person IDC hearing after his return from the hospital that he still would have been placed in the Marion Penitentiary Control Unit. After Garza was recaptured, and before he was released from the prison hospital, the IDC met to determine what, if any, disciplinary action should be taken against Garza. In this hearing, the IDC found Garza guilty of escape, a Code 102 violation, *see* 28 C.F.R. § 541.13 (1985), and recommended that he be placed in the Control Unit. It is beyond dispute that Garza escaped from the United States Penitentiary at Marion and that he was involved in the violence that ensued during his recapture.[8] The fact that he escaped from the Marion Penitentiary would alone be sufficient to support the IDC's recommendation that he be placed in the Marion Control Unit. *See* 28 C.F.R. § 541.41 (noting "[a]n escape from a correctional institution" is sufficient to support a recommendation for referral of an inmate for placement in a Control Unit). Based upon the IDC's recommendation that Garza be placed in a Control Unit, a separate hearing was held on June 13, 1979 before an independent hearing examiner to determine if Garza "was a threat to others or the orderly operation of the institution and thus [should be] placed in the Control Unit." *See* 28 C.F.R. § 541.40 (1985). Garza was accorded full procedural due process at this hearing as he received an opportunity to rebut the charges against him. *See Bono v. Saxbe,* 620 F.2d 609, 618–19 (7th Cir.1980). Although it is true that the Control Unit examiner relied, in part, on the IDC recommendation that Garza be placed in the Control Unit, the evidence is uncontroverted that Garza was guilty of escape and that the sheriff was assaulted during his recapture. During the Control Unit hearing, Garza simply contended that

---

**8.** As disclosed at oral argument, Garza was tried and convicted before an Illinois trial court of   attempted murder.

he was not a threat to the orderly operation of the institution since "the violence ... occurred outside the institution and that cannot be used against him for placement in the Control Unit"; [9] Garza did not contend that he did not escape or that he was not involved in the gun battle that occurred prior to his recapture. Had Garza been present at the IDC hearing, we fail to understand how he could have contested the IDC's findings that supported its recommendation that he be placed in the Control Unit in view of the fact that he escaped from the prison and that he participated in the violence at the time of his recapture.[10] Thus, even assuming that the plaintiff did not receive an opportunity to an in-person IDC hearing, he cannot establish, as a matter of law, that his alleged injuries were caused by this alleged constitutional deprivation.

The decision of the district court is AFFIRMED.

9. Government's Exhibit 8, Narrative Statement of Garza at the Control Unit Hearing.

10. In the plaintiff's habeas corpus action, the magistrate found that *both* the IDC hearing and the Control Unit hearing were constitutionally infirm because the Control Unit examiner relied in part on the results of the IDC hearing. Further, he concluded that "because we don't know the effect that that finding by the I.D.C. Committee had on the ultimate decision ... on the control unit placement," that placement was unconstitutional as well. Transcript of Hearing, July 21, 1982, at 29.

We do not believe that the magistrate's assessment of prejudice in the habeas proceeding binds us with respect to causation in reviewing the disposition of Garza's § 1983 claim.