**Earl WITTMER, Earl Craig Cox, and James Jeffers, Plaintiffs,**

v.

**Howard PETERS, III, and Stephen McEvers, Defendants.**

No. 94–3045.

United States District Court, C.D. Illinois, Springfield Division.

Aug. 31, 1995.

Order Denying Motion to Amend Oct. 20, 1995.

Mary Lee Leahy, Springfield, IL, for plaintiffs.

Edward J. Lewis, III, Jeffrey D. Colman, Melissa S. Widen, Jenner & Block, Chicago, IL, for defendants.

## OPINION

RICHARD MILLS, District Judge:

A question of first impression dealing with the Illinois "boot camp" program.

## BACKGROUND

Earl Wittmer, Craig Cox, and James Jeffers ("Plaintiffs") are employees of the Illinois Department of Corrections ("DOC"). Defendant Howard Peters, III, was the Director of the DOC at all times relevant to the instant dispute and Defendant Stephen McEvers is the Warden of the Greene County Impact Incarceration Program ("boot camp").

The boot camp[1] is a military-style correctional institution that is designed to instill responsibility, discipline, self-respect, and respect for authority in nonviolent first-time offenders. Eligible offenders who are sentenced to up to eight years in a traditional institution may discharge their sentences by participating in and successfully completing a 120–180 day program. Inmates at the boot camp are required to submit to an arduous schedule of paramilitary exercises, physical training, and hard labor; they also participate in intensive programs relating to education, drug treatment, prerelease preparation, and individual and group counseling.

The boot camp employs an intense, highly structured, and regimented routine which, unlike traditional prison environments, requires the staff to be verbally aggressive and confrontational towards the inmates. African Americans comprise approximately 60% to 70% of the inmate population at the boot camp.[2]

The security staff at the boot camp consists of three captains, ten lieutenants, and forty-eight correctional officers. In December of 1992, the DOC's Jacksonville Correctional Center posted ten vacant lieutenant positions that were required to be filled by March of 1993, the opening date of the boot camp. Plaintiffs applied for promotions to those positions. Four of the ten positions were filled through an "upward mobility program," a contractually mandated, non-discretionary promotion system based on seniority. Three of these promotions were awarded to white males; the fourth went to an African American female. The remaining six lieutenant positions were filled through a multifaceted selection process, which consisted of (1) a physical agility test, (2) a written examination, (3) an oral review, and (4) Warden McEvers' personal evaluation of the candidates' qualifications, prior work experience, and relevant skills and attributes.

Eighty-four lieutenants, sergeants, and correctional officers from Jacksonville and other institutions around the State applied for the six lieutenant positions and the three captain positions. Each of the eighty-four applicants who participated in the selection process had received an "A" grade from the Department of Central Management Services and were therefore qualified for a lieutenant position. Forty-nine of the applicants, including Plaintiffs, passed the physical agility test and were otherwise qualified to take the written examination and participate in the oral interview process. Following the written examination and oral interview, the scores of each of the forty-nine candidates

---

1. The boot camp is affiliated with the Jacksonville Correctional Center, a minimum security institution. Warden McEvers oversees the operation of both facilities.

2. Although the composition of the inmate population varies each time a class of inmates graduates and a new class enters, the proportion of black inmates has not fluctuated drastically since the boot camp's opening in March 1993.

were compiled and each candidate was then ranked according to his respective score.

Warden McEvers decided to promote Kim Kirchner, a white male who ranked first, (2) Frank Spaulding, a white male who ranked fourth, (3) Jeff Bates, a white male who ranked fifth, (4) Scott Lancaster, a white male who ranked tenth, (5) Keith Graham, a white male who ranked eleventh, and (6) Gregory Hilliard, an African American male who ranked forty-second. Plaintiffs Wittmer, Cox, and Jeffers—white males who ranked third, sixth, and eighth, respectively—were not promoted.

On the "employment decision form," Warden McEvers noted that Hilliard was promoted "primarily because he is African American." Warden McEvers further noted that the DOC "endeavor[s] to recruit and promote qualified minorities not only to meet affirmative action goals, but also because the majority of our inmates are minorities."

The DOC did *not* have an affirmative action plan governing the promotion of minorities to the rank of lieutenant.[3] There was also no evidence of past discrimination against minorities in the DOC's promotional practices. Prior to Hilliard's promotion, two of the forty-eight correctional officers at the boot camp were African American and, as noted above, one of the lieutenants was an African American female.

This case comes to us on cross motions for summary judgment.

### LEGAL STANDARD—SUMMARY JUDGMENT

█ Under Fed.R.Civ.P. 56(c), summary judgment shall be granted if the record shows that "there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Black v. Henry Pratt Co.*, 778 F.2d 1278, 1281 (7th Cir.1985). The moving party has the burden of providing proper documentary evidence to show the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S.Ct. 2548, 91

L.Ed.2d 265 (1986). A genuine issue of material fact exists when "there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). Unquestionably, in determining whether a genuine issue of material fact exists, the evidence is to be taken in the light most favorable to the nonmoving party. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970). Once the moving party has met its burden, the opposing party must come forward with specific evidence, not mere allegations or denials of the pleadings, which demonstrates that there is a genuine issue for trial. *Howland v. Kilquist*, 833 F.2d 639 (7th Cir.1987).

### DISCUSSION/ANALYSIS

█ Plaintiffs initiate this action under 42 U.S.C. § 1983, claiming that Warden McEvers' decision to promote Hilliard to a lieutenant position because he was African American violated their rights guaranteed by the Fourteenth Amendment's Equal Protection Clause. In order to succeed under § 1983, Plaintiffs must establish two elements: (1) that the conduct complained of was committed by a person acting under color of state law and (2) that this conduct deprived them of rights, privileges, or immunities secured by the Constitution or the laws of the United States. *New Burnham Prairie Homes v. Village of Burnham*, 910 F.2d 1474, 1479 (7th Cir.1990) (citing, *Parratt v. Taylor*, 451 U.S. 527, 535, 101 S.Ct. 1908, 1912, 68 L.Ed.2d 420 (1981)). No one disputes that Warden McEvers' conduct, if actionable, was committed while acting under color of state law; accordingly, this order is concerned solely with the second element.

### I

█ The Fourteenth Amendment provides that "No State shall ... deny to any person within its jurisdiction the equal protection of the laws." Because decisions based on one's race are "in most circumstances irrelevant

---

**3.** The DOC did have an affirmative action plan for the *hiring* of minorities, but not for the pro- motion of minorities.

and therefore prohibited," *Hirabayashi v. United States,* 320 U.S. 81, 100, 63 S.Ct. 1375, 1385, 87 L.Ed. 1774 (1943), "inherently suspect," *Wygant v. Jackson Bd. of Educ.,* 476 U.S. 267, 273, 106 S.Ct. 1842, 1846, 90 L.Ed.2d 260 (1986) (quoting, *Univ. of California Regents v. Bakke,* 438 U.S. 265, 291, 98 S.Ct. 2733, 2748, 57 L.Ed.2d 750 (1978)), and "so seldom provide a relevant basis for disparate treatment," *Fullilove v. Klutznick,* 448 U.S. 448, 534, 100 S.Ct. 2758, 2803, 65 L.Ed.2d 902 (1980) (Stevens, J., dissenting); as recently stressed by the United States Supreme Court, "any person, of whatever race, has the right to demand that any governmental actor subject to the Constitution justify any racial classification subjecting that person to unequal treatment under the strictest judicial scrutiny." *Adarand Constructors, Inc. v. Pena,* —— U.S. ——, ——, 115 S.Ct. 2097, 2111, 132 L.Ed.2d 158 (1995). In other words, racially motivated employment decisions are constitutional only if they (1) are justified by a compelling governmental interest and (2) are narrowly tailored to further that compelling interest. *Adarand,* at ——, 115 S.Ct. at 2113; *Wygant,* 476 U.S. at 274, 106 S.Ct. at 1847.

■ Regarding the first prong of the Court's examination, Defendants argue that the State of Illinois has a compelling interest in the safe, efficient, and successful operation of its boot camps. Due to the fact that the majority (roughly 60% to 70%) of the boot camp's inmates were expected to be African American, Defendants claim that sufficient African American representation at the lieutenant position was necessary in order to ensure that the boot camp would function safe and properly. Therefore, Warden McEvers argues that he was entitled to consider race in the challenged promotional decision due to the "operational needs" of the boot camp.

■ The Court agrees with Defendants' position that the State of Illinois has a compelling interest in the safe and proper functioning of its boot camps.[4] It is also our belief that Warden McEvers' act of promoting Hilliard to a lieutenant position because he is African American was a prudent decision; a decision that reflects a practical, realistic, and sensible approach to prison management. *See Minnick v. California Dep't of Corrections,* 95 Cal.App.3d 506, 157 Cal.Rptr. 260 (1979), *cert. dismissed,* 452 U.S. 105, 101 S.Ct. 2211, 68 L.Ed.2d 706 (1980); *Detroit Police Officers' Ass'n v. Young,* 608 F.2d 671, 695–96 (6th Cir.1979); *Barhold v. Rodriguez,* 863 F.2d 233, 238 (2nd Cir.1988).

■ The Court's beliefs, however, are not the issue here. It is important to keep in mind that the Court must strictly scrutinize Warden McEvers' decision. In short, based on this stringent standard, we believe the evidence is insufficient to support Defendants' position that Hilliard's promotion to the rank of lieutenant was necessary for the safe and proper functioning of the boot camp.

Here's why.

In support of their position, Defendants submit the affidavits of Warden McEvers; former Director of the Illinois DOC, Howard Peters; current Director of the Illinois DOC, Odie Washington; Director of the Oklahoma Department of Corrections, Larry Fields; a report by expert, Dr. Peter Scharf; and the

---

**4.** Plaintiffs argue that the *only* instance where a state may take race into account in an employment decision is to remedy past discrimination. In short, Plaintiffs' contention is simply wrong. That has never been the law in this circuit, nor anywhere in this country. *See Adarand* at ——–——, 115 S.Ct. at 2127 (Stevens, J., dissenting); *Wygant,* 476 U.S. at 286, 106 S.Ct. at 1853 (Connor, J., concurring) ("And certainly nothing the Court has said today necessarily forecloses the possibility that the Court will find other governmental interests which have been relied upon in the lower courts . . . to be sufficiently 'important' or 'compelling' to sustain the use of affirmative action policies."); *Metro Broadcasting, Inc. v. F.C.C.,* 497 U.S. 547, 566, 110 S.Ct. 2997, 3009,

111 L.Ed.2d 445 (1990) (Although not analyzed under strict scrutiny, the Court held that the F.C.C. policy at issue "serve[d] the important governmental objective of broadcast diversity."); *Britton v. South Bend Community School Corp.,* 819 F.2d 766, 773 n. 1 (7th Cir.1987) ("Remedying past discrimination is not necessarily the only government purpose sufficiently compelling to justify the remedial use of race."). As will be discussed in this opinion, a State may take race into account for any purpose as long as there is a compelling interest and the means employed are narrowly tailored to further that interest. We are not aware of any opinion which holds that the *only* compelling governmental interest is remedying past discrimination.

results of a recent national study by Dr. Richard C. McCorkle and Dr. Terance D. Miethe.

First, we do not find the testimony of Defendants Warden McEvers, former Director Peters, and current Director Washington helpful to our inquiry. Although they express legitimate opinions about the need for minority representation at all ranks within the correctional system, in themselves, they contain no factual support for the position that minority representation at the rank of lieutenant was necessary for the safe and effective operation of the boot camp.[5] *See Hayes v. North State Law Enforcement Officers Ass'n,* 10 F.3d 207, 215 (4th Cir.1993).

 The testimony of Larry Fields falls into this same category. Although he expresses the same concerns as Warden McEvers, Director Peters, and Director Washington, it is in his best interest to support Defendants' position here. Based on Director Fields' affidavit, it appears that the Oklahoma Department of Corrections also operates under the same informal policy of promoting individuals as a result of their race. We are by no means suggesting that the testimony of the four individuals mentioned above is distorted or misrepresented to support their position. Indeed, their testimony is based on years of experience and expresses legitimate concerns about the safety and proper functioning of correctional institutions. However, once again, it is imperative to stress that the Court must analyze this issue under the strictest of scrutiny. Accordingly, we need more evidence—"objective" evidence—in support of the contention that adequate minority representation at the rank of lieutenant is necessary for the safe and proper functioning of a boot camp. *See Hayes,* 10 F.3d at 215. Certainly, the Equal

Protection Clause mandates something more than the subjective opinion testimony of individuals who have a direct or indirect interest in the outcome of the instant litigation.

This takes us to the report of Dr. Scharf and the national study conducted by Dr. McCorkle and Dr. Miethe. The study by Dr. McCorkle and Dr. Miethe is of no particular relevance to the instant dispute. Their study concerns "the roots of prison violence," *it has nothing to do with boot camps.* In summary, their study concludes that as the percentage of minority staff representation increases (to a certain extent) at minimum, medium, and maximum security prisons, the amount of prison disorder decreases. Dr. Scharf's conclusions in this area are also based on data compiled primarily from studies of traditional correctional institutions, *not boot camps.*

At this point of our discussion, it appears it is appropriate to discuss some critical distinctions between a boot camp and a traditional correctional institution. As repeatedly stressed by Defendants, the boot camp is a very unique environment. There is little resemblance between a boot camp and a traditional prison environment. A boot camp's inmate population is comprised of non-violent offenders between 17 and 35 years of age who have received a sentence of imprisonment of eight years or less. The eligible candidates must volunteer for admission to the boot camp program, no one is required to participate in the program against his will. Further, upon successful completion of the 120 to 180 day program, the inmate's sentence is reduced to time served.

Based on these critical distinctions alone, we fail to see how studies concerning violence in traditional prison systems are relevant to the potential for violence in a boot camp.[6]

---

5. It appears to the Court that at the time Warden McEvers made the decision to promote Hilliard because of the "operational needs" of the boot camp, he had no experience with the operation of a boot camp. All of his experience was acquired by working in traditional correctional institutions. Yet, Defendants repeatedly stress how the boot camp environment is entirely distinct from that of a traditional correctional institution. Accordingly, how did Warden McEvers know that the "operational needs" of the boot camp necessitated the promotion of two African Americans to the rank of lieutenant?

6. Defendants not only claim that adequate minority *staff* representation is necessary to promote a safe institution, they also claim that minority representation at the *lieutenant* position is essential. The study by Dr. McCorkle and Dr. Miethe does not differentiate between staff positions. Their study is concerned with the "ratios of white-to-black *correctional officers,*" not *lieutenants.* The Roots of Prison Violence, Crime & Delinquency, Vol. 41 No. 3, pg. 328 (July 1995) (emphasis ours). Thus, one question immediately arises: why couldn't Warden McEvers hire

For example, doesn't the fact that only younger, *non-violent* (often first-time) offenders are eligible for the boot camp program decrease the likelihood of violence? And what about the fact that an inmate who successfully completes the program can have his entire sentence reduced to time served? In fact, an inmate can have an eight year sentence reduced to 180 days or less. Thus, an inmate has every incentive to "behave" and successfully complete the program, otherwise, he will be returned to prison to serve a more lengthy sentence. Furthermore, unlike traditional prison systems, the boot camp's inmates have very little "free time." They are required to submit to an arduous schedule of paramilitary exercises and they also participate in intensive education, drug treatment, prerelease preparation programs and individual and group counseling. Don't these programs also reduce the likelihood of violence? [7]

In summary, we fail to comprehend how a study concerning completely distinct correctional environments is relevant to the instant dispute surrounding boot camps. [8] In their memoranda submitted to the Court, Defendants continuously discuss and emphasize the uniqueness of the boot camp environment. Yet, they support their position by relying on studies of traditional correctional institutions. As discussed above, the boot camp environment presents many distinct variables that potentially nullify the conclusions rendered in traditional prison studies. Such a visible inconsistency will not pass muster under a strict scrutiny analysis. Perhaps the concerns raised by the Court may prove to be misguided and incorrect. That is not the point, however. The point is that they are legitimate concerns that no one has addressed.

Safety was only one of the concerns expressed by Defendants, though. Defendants also claim that the promotion of Hilliard to the rank of lieutenant was necessary for the boot camp to function properly, to achieve its goals. Due to Defendants' failure to adequately develop this issue, this portion of the "operational needs" issue is not entirely clear. We will do our best, however.

According to Warden McEvers' affidavit, the goals of the boot camp are to "instill discipline and respect in the inmates so that they can avoid a return to prison in the future." It appears, that Defendants' primary concern here is with the inmates' "perception of fairness." Generally speaking, Defendants' position is that without two African American lieutenants, [9] the inmates would perceive the boot camp's highly confrontational operating philosophy as being racially motivated. This, in turn, would lead to racial tensions which would ultimately defeat the boot camp's purpose of instilling discipline and respect for authority. Thus, we need to know why the inmates' "perception of fairness" is essential to furthering the boot camp's goals of instilling discipline and respect for authority and why the promotion of an African American to a lieutenant position was necessary to boost the "perception of fairness."

It is important to note that at the time of Hilliard's promotion, there were three African Americans on the boot camp's staff; two African American males were correctional officers and one African American female was a lieutenant. It is also important to recognize a distinction here. That is, Defen-

---

more African American *correctional officers* instead of awarding a promotion to a *lieutenant* position because of one's race?

7. Indeed, as noted by Dr. McCorkle and Dr. Miethe's study, "it appears that institutional order is *best promoted* by involving inmates in programs that offer, not just structure, [ ] opportunities for self-improvement." The Roots of Prison Violence, Crime & Delinquency, Vol. 41 No. 3, pg. 328 (July 1995) (emphasis ours).

8. On page 2 of the cover letter accompanying the study, Dr. McCorkle and Dr. Miethe note that

"because boot camps are a relatively recent phenomenon, only 23 boot camps were included in the census of U.S. prisons and only 8 of these programs had predominately black populations. *This small number precludes meaningful statistical analysis.*" (emphasis ours). Thus, apparently, even the academics who conducted the study recognized its inapplicability to boot camps.

9. As noted above, an African American female was promoted to lieutenant through the nondiscretionary "upward mobility program."

dants are not only claiming that adequate African American representation is required at the *correctional officer* position, but also as to those who supervise the correctional officers, the *lieutenants*.[10]

With this in mind, the study by Dr. McCorkle and Dr. Miethe offers no support for Defendants' position. To the extent that their report even addresses the "perception of fairness" issue, it does not differentiate between the correctional officer and lieutenant positions.

With respect to Dr. Scharf's report, in many instances it does not appear that he is framing the issue properly. Throughout Dr. Scharf's report, he is constantly factoring into his analysis Hilliard's personal qualities and prior experiences.[11] Whether Hilliard's personal qualities and past experiences would enable him to be an effective lieutenant at a boot camp is irrelevant to the issue before the Court. Hilliard was not promoted as a result of his personal qualities and prior experience. Indeed, he was promoted "primarily" because he is African American. But, we need to know why the inmates' "perception of fairness" and African American representation at the *lieutenant* position is necessary for the boot camp to achieve its goals. This, Dr. Scharf's report fails to answer.

In fact in opinion 2.1 of his report, Dr. Scharf concludes that the promotion of Hilliard to a lieutenant position *"might"* enhance the perception that the program was color blind. Strict scrutiny demands something more than "might."

Furthermore, as noted by Dr. Scharf after his visit to the boot camp, "the perception that staff were strict but fair was an essential element of program success."[12] Thus, why

is it necessary for the boot camp to have African American representation at the *lieutenant* position to convey the perception of fairness? After viewing the videotape of the intake process, we observed that both white and black inmates were treated identically by both white and black *correctional officers*. Doesn't equal treatment by both white and black officers enhance the perception of fairness?

In summary, we are not convinced that Dr. Scharf's report is strong enough to support Defendants' position. First, in many instances, Dr. Scharf considers issues other than race. Second, according to Dr. Scharf's very own report, Hilliard's promotion *"might"* enhance the perception that the program is color blind. Finally, there is not enough evidence as to why African American representation at the *lieutenant* position, as opposed to the *correctional officer* position, is essential to the proper functioning of a *boot camp*, as opposed to a traditional prison environment.

 Although we believe a state has a compelling interest in the safe and proper functioning of its boot camp, we do not believe the evidence is sufficient to support Defendants' claim that Hilliard's promotion to a lieutenant position was necessary to promote this compelling interest.[13] Thus, Plaintiffs are entitled to summary judgment on their equal protection claim.[14]

## II

Next, Defendants claim that if they are liable for violating the Fourteenth Amendment's Equal Protection Clause, they are nevertheless entitled to qualified immunity.

The Court agrees.

---

10. *See* footnote 6.

11. For example, see Dr. Scharf's report opinion 1.4, 2.3, 2.4, and 2.5.

12. It should be noted that it appears Dr. Scharf's only "direct" experience with the functioning of a boot camp involved a single visit to the boot camp at issue on February 28, 1995.

13. Since the evidence is insufficient to support Defendants' claim, there is no need to determine if Warden McEvers conduct was narrowly tailored.

14. In our order of August 4, 1995, we discussed Director Peters' liability. In summary, although Director Peters was not involved in the promotional process other than administratively approving each promotion, as Director of the DOC he was well aware of and condoned the informal policy of promoting individuals based on race. Under *Rascon v. Hardiman*, 803 F.2d 269, 274–75 (7th Cir.1986), Director Peters' conduct supports a finding of liability in both his official and individual capacities. *See Dye v. Sheahan*, 1995 WL 109318, *6–7, (N.D.Ill. March 10, 1995).

Under the doctrine of qualified immunity, "government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396 (1982). The test for immunity is whether "the law was clear in relation to the specific facts confronting the public official when he acted." *Rakovich v. Wade*, 850 F.2d 1180, 1209 (7th Cir.1988) (en banc), *cert. denied*, 488 U.S. 968, 109 S.Ct. 497, 102 L.Ed.2d 534 (1988). "Before a right is clearly established it must be sufficiently particularized to put potential defendants on notice that their conduct is unlawful." *Id.* (quoting, *Colaizzi v. Walker*, 812 F.2d 304, 310 (7th Cir.1987) (Bauer, C.J., dissenting)). "Once the defendant's actions are defined or characterized according to the specific facts of the case this characterization is compared to the body of law existing at the time of the alleged violation to determine if constitutional, statutory, or case law shows that the now specifically defined actions violated the clearly established law." *Id.* The plaintiff "bears the burden of establishing the existence of the allegedly clearly established constitutional right." *Id.*

Here, Warden McEvers promoted an individual because he is African American due to the perceived "operational needs" of the boot camp.[15] Accordingly, Plaintiffs must identify identical or closely analogous case law prior to Warden McEvers' conduct that clearly establishes that such conduct was unconstitutional. *Id.* For obvious reasons, Plaintiffs fail to identify any such cases or authority. Indeed, this is essentially an issue of first impression.

As already discussed, this issue is grounded in the Fourteenth Amendment's Equal Protection Clause. The Equal Protection Clause permits race based decisions as long as such classifications serve a compelling state interest and are narrowly tailored to further that interest. *Adarand*, at ——, 115 S.Ct. at 2113. The sparse closely analogous case law in this area is generally consistent with Warden McEvers' claim that adequate minority representation in certain law enforcement fields is essential to the safe and proper functioning of a particular law enforcement body. *See Minnick v. California Dep't of Corrections*, 95 Cal.App.3d 506, 157 Cal.Rptr. 260 (1979); *cert. dismissed*, 452 U.S. 105, 101 S.Ct. 2211, 68 L.Ed.2d 706 (1980); *Hayes v. North State Law Enforcement Officers Ass'n*, 10 F.3d 207 (4th Cir. 1993); *Barhold v. Rodriguez*, 863 F.2d 233, 238 (2nd Cir.1988); *Detroit Police Officer's Ass'n v. Young*, 608 F.2d 671 (6th Cir.1979), *cert. denied*, 452 U.S. 938, 101 S.Ct. 3079, 69 L.Ed.2d 951 (1981).

Plaintiffs offer three arguments against Defendants' qualified immunity claim. *First,* Plaintiffs claim that case law supports the position that race may be taken into account *only* to remedy past discrimination, and since there was indisputably no past discrimination here, Defendants violated clearly established law. As discussed in footnote 4, this argument is simply wrong.

*Second,* Plaintiffs attack the second prong of the strict scrutiny test; arguing that Warden McEvers' act of promoting Hilliard was not narrowly tailored to further the compelling state interest as a matter of law. Specifically, because there was no formal, *written* plan acknowledging the operational needs of the boot camp, Plaintiffs claim the promotion of Hilliard was not narrowly tailored to further the alleged compelling state interest. However, Plaintiffs fail to cite any authority which *requires* the drafting of a formal, written plan in order to satisfy the second prong of the strict scrutiny analysis; nor is this Court aware of any such authority.[16]

---

**15.** In their discussion concerning qualified immunity, Plaintiffs do not dispute that Warden McEvers promoted Hilliard due to the perceived "operational needs" of the boot camp. Indeed, Plaintiffs offer no argument suggesting otherwise. Regardless, based on the deposition testimony and the "employment decision form," it appears clear to the Court that the perceived "operational needs" of the boot camp was in fact the primary motivating factor behind Warden McEvers' promotional decision.

**16.** Because we concluded that the evidence was insufficient to support Defendants' claim, there was no need for the Court to discuss whether Warden McEvers' act of promoting Hilliard was

*Third,* Plaintiffs claim that Title VII prohibits the use of a "business necessity defense" based on race. Regardless of what Title VII prohibits, the Equal Protection Clause allows race based decisions if a compelling state interest exists and the means employed are narrowly tailored to further that interest. Furthermore, as cited above, the closely analogous case law in this area supports Warden McEvers' conduct. Thus, whatever impact Title VII has on this issue, it certainly does not clarify matters.

Therefore, since Plaintiffs have failed to carry their burden of establishing that Defendants were on notice that their actions violated clearly established law, Defendants are entitled to qualified immunity.

■■■■■ Of course, "qualified immunity shields defendants only in their individual capacities." *Knox v. McGinnis,* 998 F.2d 1405, 1412 (7th Cir.1993). Here, Warden McEvers and Director Peters were also sued in their official capacities. However, "it is by now well settled that '[a] suit for damages against a state official in his or her official capacity is a suit against the state for Eleventh Amendment purposes.' " *Id.* Consequently, "[b]ecause the State of Illinois has not consented to being sued in federal court in the statute creating its Department of Corrections (see Ill.Rev.Stat. ch. 38, ¶¶ 1001–1201), the official capacity claims for damages are barred by the eleventh amendment." *Id.*[17]

## CONCLUSION

Based on the preceding analysis, we conclude that the State of Illinois has a compelling interest in the safe and proper functioning of its boot camps. However, we do not believe the evidence is sufficient to support Defendants' claim that the promotion of Hilliard to a lieutenant position was necessary to further that interest. Regardless, because there is no clearly established authority that could have placed Defendants on notice that

their actions violated the law (assuming they did in fact violate the law), qualified immunity shields Defendants from liability in their individual capacities. Moreover, because the State of Illinois has not consented to be sued, the Eleventh Amendment bars suit against Defendants in their official capacities.

*Ergo,* Defendants' motion for summary judgment is ALLOWED IN PART and DENIED IN PART. Plaintiffs' motion for summary judgment is ALLOWED IN PART and DENIED IN PART.

CASE CLOSED.

SO ORDERED.

## ORDER ON MOTION TO AMEND

This cause is before the Court on Plaintiffs' motion to amend the judgment entered in this action on September 1, 1995. For the reasons discussed hereafter, Plaintiffs' motion is denied.

■■■■ To summarize briefly, Plaintiffs initiated this action under 42 U.S.C. § 1983, claiming that Defendants violated their Constitutional rights by promoting an individual primarily because that individual was African American.[1] On September 1, 1995, we held that Defendants' conduct violated Plaintiffs' rights as guaranteed by the Fourteenth Amendment's Equal Protection Clause. However, we concluded further that qualified immunity and the Eleventh Amendment barred the imposition of monetary damages against Defendants in their individual and official capacities, respectively. Now, realizing that monetary damages are not obtainable, Plaintiffs request promotions to the next available lieutenant positions in the Illinois Department of Corrections ("DOC") boot camp program.

For the purposes of this order, the Court will assume that Plaintiffs' request qualifies as prospective injunctive relief and thus is not barred by the Eleventh Amendment.[2]

---

narrowly tailored to further the compelling state interest.

**17.** Neither party has addressed the Eleventh Amendment issue in their briefs.

**1.** For a more detailed statement of the facts, see the Court's order of September 1, 1995.

**2.** Neither party has addressed whether the requested relief is even available against Defendants in their official capacities. *See Pennhurst*

*See Lenea v. Lane*, 882 F.2d 1171, 1179 (7th Cir.1989) ("And even if reinstatement is permissible against the state as prospective injunctive relief under the Eleventh Amendment, [citation omitted], it is not mandatory."). As noted by the Seventh Circuit in *Lenea*, "[g]ranting equitable relief under § 1983 is within the district court's sound discretion; and its decision will not be reversed absent an abuse of discretion." *Id.*

Here, the Court believes the requested relief is far too speculative in nature to be awarded; thus, we decline to comply with Plaintiffs' request. Specifically, Plaintiffs competed for six positions at the boot camp. Five of those positions were awarded to white males; one position was awarded to an African American male (the subject of this action). Accordingly, only one of the six available promotions is at issue here.

The five white males that were promoted were ranked as follows: first, fourth, fifth, tenth, and eleventh. Plaintiffs Wittmer, Cox, and Jeffers were ranked third, sixth, and eighth, respectively. Thus, as evidenced by the numerical rankings of the individuals selected for promotion, Warden McEvers was not required to and did not purport to select the candidates in rank order; rather, their respective ranking was merely one factor to consider.

Regardless of whether Hilliard (the African American male), who was ranked forty-second, was promoted improperly, there is no evidence that any of the Plaintiffs would have been promoted in his place. Indeed, of the five white males that were selected for pro-

motions, four were ranked lower than the highest ranking Plaintiff—Wittmer—and two were ranked lower than the other Plaintiffs—Cox and Jeffers. Thus, all Plaintiffs were passed-over for lower ranking white individuals. Of course, that does not mean that one of them would not have been selected for the last remaining promotion. The Court is merely concluding that whether one of the Plaintiffs would have received the final promotion in Hilliard's place is unknown and amounts to nothing more than speculation.

Furthermore, as noted above, Plaintiffs dispute only one of Warden McEvers' selections. Yet, all three are now asking to be promoted. Logically, even if one of the Plaintiffs would have been selected for the final promotion, only *one* would have been selected, *not all three.* Plaintiffs advance no argument as to why one of them would have been promoted in place of the other two. Once again, the speculative nature of the requested relief is apparent.[3]

Accordingly, we decline to order the DOC officials to promote Plaintiffs to the next available lieutenant positions since it is far too speculative as to whether any one of them would have been promoted in place of Hilliard.

*Ergo*, Plaintiffs' motion to amend the judgment (d/e 127) is DENIED.

*State School & Hosp. v. Halderman*, 465 U.S. 89, 104 S.Ct. 900, 79 L.Ed.2d 67 (1984).

3. The speculative nature of *any* damages in this action raises an interesting issue, and the Court is surprised Defendants neglected to raise this issue at an earlier stage of the proceeding. That is, "[i]t is well established that 'a § 1983 action is a tort damage action....'" *Garza v. Henderson*, 779 F.2d 390, 395 (7th Cir.1985). Thus, as in any common law tort action, the plaintiff bears the burden of establishing "the requisite causal connection between the alleged constitutional deprivation and his injury." *Id.*

Accordingly, although a Constitutional violation may have occurred, since it is mere speculation as to whether any of the Plaintiffs would

have been promoted, what damages do the Plaintiffs have here? In other words, even if Warden McEvers did not take race into consideration regarding the final lieutenant position, certainly Plaintiffs cannot establish that one of them would have been selected for that position. Thus, since Plaintiffs cannot establish that one of them would have been selected for the final promotion, they cannot establish a causal link between the Constitutional violation and the injury of which they complain. Since they have no identifiable injury, can they prevail under § 1983? *See Button v. Harden*, 814 F.2d 382, 383 (7th Cir.1987) ("To prevail under [§ 1983] a plaintiff must show not only that his federal rights were violated, but also that, had it not been for the violation, the injury of which he complains would not have occurred....").